UNITED STATES of America

v.

Edward Patrick KENNEY and Mark Needelman.

Crim. Nos. 84–00007–01–P, 84–00007–02–P.

United States District Court, D. Maine.

Oct. 15, 1984.

Richard S. Cohen, U.S. Atty., Joseph H. Groff III, Asst. U.S. Atty., Portland, Maine, for plaintiff.

Daniel G. Lilley, Portland, Maine, Julian Sweet, Jack Simmons, Berman, Simmons & Goldberg, Lewiston, Maine, for defendant.

OPINION AND ORDER ON PENDING MOTIONS TO SUPPRESS AND FOR A HEARING UNDER *FRANKS v. DELAWARE*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)

GENE CARTER, District Judge.

*I. Pending Motions*

This matter is before the Court on three motions:

(1) Defendant Kenney's Motion to Suppress and For Return of Seized Property (Docket Item # 3), filed on February 10, 1984;

(2) Defendant Needelman's Motion to Suppress and [for] Return of Property Pursuant to Fed.R.Crim.P. 41 (Docket Item # 19), filed on February 13, 1984; and

(3) Defendant Needelman's Motion for Disclosure of Search and Seizure Procedures (Docket Item # 27), filed on February 13, 1984.[1]

---

1. This motion became moot in the course of the hearing as a full opportunity was afforded to

All three motions were consolidated for hearing. The first stage of that hearing took place on June 20, 1984, and resulted in a bench ruling by the Court disposing of certain issues generated by the motions. The second stage of the hearing took place on June 25, 1984, and dealt principally with issues going to the validity of certain search warrants issued herein and challenged by the motions. The issues so generated are presently before the Court.

## II. Procedural History of Case

### A.

In order to set the context for the Court's present rulings, it is first necessary to give a brief explication of the somewhat complex procedural history, both of this case and of another case related to it. As the result of a continuing investigation of illicit drug trafficking in the Portland, Maine area, the Defendants Needelman and Kenney were arrested on January 12, 1984, Defendant Needelman in a parking lot at the Westbrook Mall, and Defendant Kenney in a car leaving the mall area. Significant elements of the information generated by law enforcement agents in the course of that investigation came from a former drug dealer "turned" informant, James Gregory Anderson. The investigation resulted in indictments in two separate cases. In the first of these (referred to herein as "the Field case"), three defendants, Edward Kenney, Steven Martin and Wayne Field, were charged with conspiracy to knowingly and intentionally possess, with intent to distribute, quantities of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and Defendant Field was also charged with two counts of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1).

This case is the second of those cases. In it Defendants Edward Kenney and Mark Needelman are charged in Superseding Indictment # 2 with conspiracy to commit the offense of knowingly and intentionally possessing with intent to distribute a substan-

tial quantity of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Defendant Kenney is charged in separate counts with possessing, on his person on January 12, 1984, approximately three grams of a mixture containing cocaine, in violation of 21 U.S.C. § 844(a), and on the same date with possessing approximately ten grams of a mixture containing cocaine on premises located at 1514 Forest Avenue, Portland, Maine, in violation of 21 U.S.C. § 844(a).

Evidence in both of the two cases was gathered as the result of (1) the arrest of Defendant Needelman; and (2) the issuance of some six search warrants. Those warrants are also attacked by the motions before the Court in this case.

Pretrial motions were filed in both cases. All motions were ruled on or otherwise disposed of in the *Field* case, which proceeded to trial on May 15, 1984. That trial resulted in a declaration of a mistrial in favor of Defendants Kenney and Martin. Defendant Field elected not to accept a mistrial, and was found guilty on May 25, 1984, on all counts of the indictment in that case. He was sentenced on June 22, 1984. Kenney has not yet been retried in the *Field* case, and Martin tendered a change of plea under Fed.R.Crim.P. 11 on October 5, 1984.

The Court ruled on two motions in the pretrial stages of the *Field* case that have some pertinence here. Defendant Kenney there filed a Motion to Suppress Evidence seized pursuant to a search warrant which authorized a search of the premises where Defendant Kenney lived at 1514 Forest Avenue, Portland, Maine. The Defendant's argument was "that there was no probable cause for issuance of a warrant *to search for items other than cocaine*" at those premises. *United States v. Kenney*, Crim. No. 84–00008–02, slip op. at 1 (D.Me. May 10, 1984) (emphasis added). The application for the warrant was supported by the

defense counsel in the course of the suppression hearings for inquiry into the Government's conduct of its activities resulting in the search or seizure of evidence, excluding only an actual

*Franks v. Delaware* hearing. Accordingly, this Court finds it unnecessary to rule on this motion.

affidavit of DEA Resident Agent-In-Charge, Gustave Fassler, dated January 12, 1984. That affidavit is also the principal affidavit underlying the warrants at issue in this present case. By its Memorandum of Decision and Order of May 10, 1984, the Court granted the motion as to certain seized firearms and denied the motion as to seized items consisting of cash and certain contraband substances other than cocaine. The Court concluded that while the affidavit did not establish probable cause to search *for firearms,* probable cause was established to search for the other items. The challenge there made concerned exclusively the permissible scope of the search pursuant to the warrant rather than the existence of underlying probable cause for its issuance.

The second motion filed in the *Field* case of possible consequence here was that of all three Defendants seeking a pretrial hearing under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) "to examine the defendant's charge that the affidavit of DEA Agent Gustave Fassler ... contains factually erroneous statements of fact made either deliberately or with reckless disregard for the truth." *United States v. Field,* Crim. No. 84–00008–02, slip op. at 1 (D.Me. May 11, 1984). The Fassler affidavit is that previously referred to, dated January 12, 1984. Defendants attacked its use, stating that the challenged statements were the principal supporting material in the applications for the six search warrants.

Defendants in the *Field* case set forth two bases for their motion seeking a *Franks* hearing: (1) the omission from the affidavits (including principally that of Agent Fassler) of "facts critical to the magistrate's assessment of both the credibility of undercover informant James Gregory Anderson and the reliability of the information provided by Anderson to affiant Fassler," *id.* at 2; and (2) the existence of a claimed misrepresentation of fact in paragraph 8 of the Fassler affidavit. The Court denied the motion for a *Franks* hearing in the *Field* case.

**B.**

Proceeding now to the present case, the Court notes that the motion of Defendant Kenney (Docket Item # 3) seeks to suppress and obtain return of property seized as a result of a search conducted on January 22, 1984, of the Defendant's residence at 1514 Forest Avenue, Portland, Maine, pursuant to a search warrant issued on January 12, 1984. The motion asserts: "Said search and subsequent seizure of Defendant's person and property was in violation of Defendant's Fourth Amendment rights under the United States Constitution." This assertion is supplemented by the assertion set out in Defendant Kenney's Superseding Motion to Suppress, filed on June 11, 1984, which adds: "All items thus seized were seized pursuant to an illegal search, and pursuant to an invalid search warrant, in violation of his Fourth Amendment rights." It was agreed between counsel for the Government and Defendant Kenney that the Court would also treat this motion as asserting a claim for a hearing under *Franks v. Delaware. See* transcript at 128. It was also agreed that the evidence taken out in the suppression proceedings would be considered by the Court as the Defendants' showing on the *Franks* motion.

Thus, this motion raises a question as to the validity of the search warrant for the search of the Defendant Kenney's premises at 1514 Forest Avenue, Portland, Maine. In addition, it raises a claim to entitlement to a hearing under *Franks v. Delaware* permitting the Defendant to launch an attack upon the sufficiency of the Fassler affidavit because it is claimed to contain in paragraph 17 factually erroneous information included by the Government intentionally or with a reckless disregard for the truth.

The motion of Defendant Needelman (Docket Item # 19) is somewhat broader in scope. In paragraph 2, it seeks suppression of "all evidence seized at the time of the Defendant's arrest and all evidence seized subsequent to his arrest, pursuant to warrant or otherwise." That paragraph

asserts that the Defendant was "arrested in violation of his rights as secured by the Fourth Amendment of the United States Constitution and all evidence seized ... constitute[s] fruit of that illegal arrest."

Paragraph 2 of the motion seeks to suppress all evidence seized at the time of the Defendant's arrest or subsequent thereto, whether by warrant or otherwise. Defendant asserts as the grounds for the motion that a brown paper bag allegedly carried by the Defendant at the time of his arrest was illegally searched in violation of the Defendant's Fourth Amendment rights, either at the time of its seizure or before the obtaining of a warrant, and that information so obtained "tainted" "all evidence seized subsequent to that time."

Paragraphs 3, 4 and 5 seek suppression of all evidence seized pursuant to searches made of the Defendant's safe deposit boxes, his residence and his car, and all evidence obtained as a result of those searches. The motion asserts that all such searches were conducted pursuant to a warrant which was issued without probable cause and in violation of the Defendant's Fourth Amendment rights. Finally, in paragraph 6 the Defendant's motion asserts a claim to suppression of all evidence seized pursuant to the warrant searches of his safe deposit boxes on the grounds that "the Government has failed to establish any nexus between such evidence seized and the alleged criminal activities as set forth in the Indictment or probable cause to justify the continued retention of the Defendant's property" in violation of the Defendant's Fourth Amendment rights.

These [2] motions thus raise the following issues for decision:

(1) whether there was probable cause for the arrest of Defendant Needelman and the seizure of the brown paper bag allegedly carried with him at the time of his arrest;

(2) whether there was probable cause for the issuance of the search warrants, execution of which produced evidence

which the Government proposes to use against the Defendants Kenney and Needelman;

(3) whether the warrant searches subsequent to the arrest of the Defendants were without probable cause because they were "tainted" by information obtained by an illegal warrantless search of the brown paper bag;

(4) whether the search of Defendant Needelman's safe deposit boxes and the seizure of their contents were valid;

(5) whether the Defendants are entitled to a *Franks* hearing in respect to the inclusion of any allegedly inaccurate information as to the contents of the brown paper bag, which was contained in Fassler's affidavit.

The Court disposed of issue (1) by its bench ruling on June 20, 1984, and hereby incorporates by reference the following findings of fact on which it was based:

THE COURT: The Court is prepared to rule at this time. The question before the Court is whether or not there's probable cause to arrest Mr. Needelman at the time in question at approximately 12:20 in the parking lot, on I believe, January 12, 1984. And, if so, whether there was a proper seizure of the bag incident to the arrest.

[¶] The Court does not give any consideration to the considerable body of testimony as to what Agent Lear and Agent Cunniff observed inside the bag as it sat on top of the car on that occasion. The reason for that being that the arrest had already been made at that point and the arrest in terms of probable cause under the law [must] be justified by what was known to the officers as of the time they made the arrest. The Court views as immaterial to the issue postured in this case on these motions what the observations of the officers were with respect to the contents of the bag.

**2.** With the permission of the Court, all motions filed by either defendant are adopted by the other defendant.

[¶] The Court is satisfied that the officers knew as of the time that Mr. Needelman was arrested that they had Mr. Anderson as an informant who was undertaking transactions on behalf of the Government in the course of the Government's investigation of traffic in cocaine in the Portland area; that he had previously provided information; they had previously found that information to be reliable in some respects; that they had overheard certain conversations between Mr. Anderson and various individuals, including Mr. Kenney, on several occasions, that had to do with drug trafficking, specifically cocaine trafficking; that these conversations had been overheard via a wire transmission when Mr. Anderson had undertaken to conduct transactions subject to monitoring by wire transmissions.

[¶] They knew that on the day in question Mr. Anderson undertook to consummate a transaction with Mr. Kenney who was known to be Mr. Anderson's regular source of cocaine in significant quantities, principally in kilo lots, and that on that day he had been provided with money in the amount of some $61,000 in white envelopes, placed in a vinyl or simulated leather packet, given to Mr. Anderson, and they knew or had good reason to believe that he had taken that packet with the money in it to his meeting at Mr. Kenney's house with Mr. Kenney.

[¶] They overheard the conversation there that took place with respect to the fact that the money was $7,257 short from what had previously been apparently discussed between Mr. Anderson and Mr. Kenney and they overheard the conversation to the effect that Mr. Kenney would nevertheless try to get the kilo of cocaine from his source in spite of that shortage with some kind of an arrangement being made so that the shortage could be promptly made up. They were aware that the usual practice by which— on the basis of information provided by Mr. Anderson that the usual practice by which he and Mr. Kenney conducted these transactions was that the money was delivered to Mr. Kenney at his house.

[¶] Both parties then departed from that house and that later on the same day, Mr. Anderson returned to Mr. Kenney's house and at that time he received the cocaine from Mr. Kenney. He knew that on this occasion after these discussions which the officers had overheard via the wire transmission, both parties did leave the Kenney residence. Mr. Anderson drove Mr. Kenney in his car to a local Mobil filling station and then Mr. Anderson departed the area. They knew Mr. Kenney had just driven, because of their aerial surveillance of his vehicle, to the Westbrook Mall parking area. And they knew that he had there encountered a pedestrian in the parking lot and had picked him up in his car. The officers then observed Mr. Needelman and Mr. Kenney sitting in the parking lot in Mr. Kenney's car having a discussion. The officers were aware, as the record in this proceeding shows, that at the time Mr. Needelman entered the car he had a paper cup apparently containing a soda or some kind of drink and he did not have with him any brown paper bag. After the discussion observed by the officers, they observed that … Mr. Needelman exited from the car with the paper cup in one hand and a brown paper bag in the other and proceed[ed] to his vehicle.

[¶] The Court is satisfied that knowing what the program was as laid out in the discussions of Mr. Kenney and Mr. Anderson for the completion of the transaction for the purchase of a kilogram of cocaine and the delivery of the money to Mr. Kenney and knowing by information provided by Mr. Anderson after he left the Kenney residence that the money had been placed by Kenney in a brown paper bag, knowing that Kenney then proceeded to meet at the time that he had said that he would meet with his source, with an individual to whom he delivered the brown paper bag and that the individual actually had in possession a brown paper bag, knowing all of that, the Court is satisfied that that [knowledge] constituted probable cause to believe that a por-

tion of the transaction for the purchase of a kilogram of cocaine as described by Mr. Kenney and Mr. Anderson in their conversations and as contemplated by the agents in setting Mr. Anderson up to conduct that transaction had in fact taken place and that by the First Circuit Court of Appeals definition of probable cause as reasonable basis to believe that an offense is in the process of being committed or has been committed, that that definition was in fact satisfied by that knowledge of the agents. The Court so finds.

Transcript of hearing at 116–19. The Court thereafter stated, "The Court has ruled that there was probable cause for the arrest and for the search incident or the seizure incident to the arrest of the brown paper bag and the motion—the pending motions to the extent they generate that issue are denied." Id. at 124.[3]

This leaves for resolution only the challenges to the warrants, the question of retention of the property seized from the safe deposit boxes, and the *Franks* hearing issue.

### III. Discussion

### A. The Sufficiency of the Showing of Probable Cause for Issuance of the Search Warrants

■ Defendants contend initially that the affidavits supporting the application

for the warrants[4] do not make out a sufficient factual showing of probable cause for the issuance of the search warrants. The Fassler affidavit of January 12, 1984, is nothing more than a compendium of the principal facts known to the officers that led to the arrests of Defendants Kenney and Needelman, facts which came to their attention at the time of the arrest, and certain information acquired later the same day during the debriefing of the officers who were at the scene of the arrest. Agent Lear's supplemental affidavits reiterate various parts of that factual data. As such, the affidavits are simply a written statement of the essence of the testimony of the officers at the hearing on which the Court found probable cause to arrest Defendant Needelman and to seize the bag. The affidavits establish a reasonable factual basis for the Magistrate to believe the following facts:

(1) Kenney and the informant Anderson had been trafficking in large amounts of cocaine over a period of time. The officers knew the details of the usual pattern of these transactions between the two men. *See* Fassler Affidavit at paragraph 4.

(2) At the instigation of the officers, Anderson had made arrangements to buy a kilogram of cocaine from Kenney under visual and auditory surveillance, on January 12, 1984. The

3. The transcript does not make it fully clear that in this quoted statement the Court misspoke itself and corrected the error. The Court ruled at the hearing only that there was probable cause for the arrest of Defendant Needelman and for the *seizure* of the brown paper bag incident to the arrest. The words "or the seizure incident to the arrest" in the Court's quoted statement were intended to correct the Court's immediately previous misstatement of its holding by replacing the words "for the search incident" in that statement.

4. The agents relied on a total of three affidavits in obtaining various search warrants from the Magistrate. They are: (1) that of Agent-in-Charge Fassler dated January 12, 1984; (2) that of Agent Lear dated January 13, 1984; and (3) that of Agent Lear dated January 23, 1984. The latter two affidavits by Lear "incorporate ... by reference" the allegations set out in the Fassler affidavit.

Three warrants were issued on January 12, 1984, and the applications for them were supported only by the Fassler affidavit. They are the warrants to search (1) Defendant Needelman's girlfriend's apartment, where he told the officers he lived; (2) Defendant Needelman's blue Volvo automobile; and (3) Defendant Kenney's residence at 1514 Forest Avenue.

One search warrant was issued on January 13, 1984, the application for which was supported by the Fassler affidavit and Lear's affidavit of January 13, 1984. This was the warrant to search Defendant Needelman's safe deposit box # 114 at the Casco Northern Bank.

Two warrants were issued on January 23, 1984, on the basis of all three of the affidavits. One of them was for the search of the brown paper bag. The other was for the search of Defendant Needelman's safe deposit box # 64 at the Casco Northern Bank.

transaction was to follow the usual pattern. *See, id.,* paragraph 14.

(3) Anderson was given $61,000, packaged in white envelopes by Det. Sgt. Cole, to make the buy from Kenney. Under surveillance, he went to meet Kenney at Kenney's house. *See, id.*

(4) During Anderson's meeting with Kenney, the agents overheard discussions of the transaction. They were told by Anderson that the money had been given to Kenney and that he had placed it in a brown paper bag. Anderson told the agents that Kenney customarily carried the money for drug transactions in a brown paper bag. *See, id.*

(5) The agents heard Kenney agree to take the money to his source to get the cocaine and to discuss the shortfall in the purchase price and subsequent payment of the $7,000 balance. *See, id.* Such conduct conformed to the known pattern of transactions between Kenney and Anderson.

(6) The agents observed Kenney and Anderson leave Kenney's house together. They followed Kenney, who switched cars and finally arrived at the parking lot of the Westbrook shopping center. He there picked up a pedestrian who was in the parking lot and later proved to be Defendant Needelman. Kenney and Needelman sat together in Kenney's car. When Needelman entered the car he had only a soda cup in his hands. Discussions between the two men were observed to take place in the car for a short time. Defendant Needelman then left the Kenney car, carrying a brown paper bag. Still carrying the bag, he walked to a car parked nearby. *See, id.* at paragraphs 15 and 16. Before the seizure occurred, Agent Lear saw in plain view, in the bag as it lay on the top of the car where it was placed by Defendant Needelman, white envelopes of the type he knew had been used to package the money given to Anderson. *See,* Lear Affidavit of 1/23/84, paragraph 6. Agent Cunniff also saw the white envelopes and saw a bill of $100 denomination in one of the envelopes. *See,* Fassler Affidavit, paragraph 17.

From these facts, the Magistrate could properly find that there was probable cause to believe that Anderson and Kenney were involved in an illicit drug transaction that required Kenney to transfer the money to an unknown source of the kilogram of cocaine that was to be the subject of the transaction. Since the agents followed Kenney to a rendezvous with Needelman in a parking lot soon after Anderson gave Kenney the money, the Magistrate could reasonably conclude that the transactions between Kenney and his unknown "source" had occurred in furtherance of the drug transaction, that Needelman was that source, and that the money had been passed to him in the bag for the purchase of a kilogram of cocaine. The agents' plain view observations of the contents of the brown paper bag immediately before it was seized by Agent Lear, as related in the affidavits, reinforced that conclusion.

The Supreme Court has ruled that once it is established that probable cause exists to believe a federal crime has been committed, a warrant may issue for the search of any property at which the magistrate has probable cause to believe fruits, instrumentalities or evidence of the crime will be found. *Zurcher v. Stanford Daily,* 436 U.S. 547, 554, 98 S.Ct. 1970, 1975, 56 L.Ed.2d 525 (1978); *United States v. Melvin,* 596 F.2d 492 (1st Cir.1979).

Since the affidavits showed probable cause to believe that a federal crime had been committed, and that the bag was an instrumentality of that crime, probable cause also existed to search the bag for further evidence, fruits or instrumentalities of the crime. Similarly, the affidavits demonstrate that the initial part of the alleged drug transaction had taken place in Kenney's house so there was probable cause to search that house for further evidence.

The affidavits also establish probable cause for the search of Needelman's blue Volvo. Needelman was attempting to open the car at the time he was arrested carry-

ing the paper bag. The affidavits suggest that Needelman was Kenney's source and that he had not entered Kenney's car carrying anything but a soda cup. After he had been given a paper bag, which inferably contained the money for the kilogram of cocaine, he returned to his car. It is, therefore, likely that the car, in which Needelman had presumably arrived at the shopping center, either contained further evidence of the alleged offenses, possibly even the anticipated cocaine, and/or was an instrumentality of that offense.[5]

The Court cannot, however, find probable cause to search the Needelman house on the basis of the information presented to the Magistrate in the affidavits. The affidavits say only that after Needelman was advised of his rights he

> told Agent Cunniff that he lives at 757 Main St., Apartment 29 in South Portland. Investigation reveals that that apartment is occupied by Earlene Mitchell, Needelman's girlfriend. That fact gives rise to cause to believe that evidence of the crime of conspiracy to possess with intent to distribute cocaine can be found at Apartment 29 at 757 Main St.

Fassler Affidavit, ¶ 18. Nothing in the Fassler affidavit or any of the others indicates that the apartment of Earlene Mitchell, where Needelman lived, was in any way connected to his alleged drug dealing. The only alleged transaction by Needelman related in the affidavits took place in the parking lot of a shopping center far from the apartment. The affidavits do not show that Needelman had come from the apartment to this meeting with Kenney or that he intended to return to it. Earlene Mitchell, lessor of the apartment, is not mentioned in any connection with the alleged transaction.

■ Although there need not be absolute proof that an alleged drug dealer keeps his drugs, records, etc. at his home, there must be some indication that the home is impli-

cated to warrant the major intrusion of a search. *See United States v. Gramlich,* 551 F.2d 1359 (5th Cir.1977); *see* also W. LaFave, *Search and Seizure* § 3.7 at 706–07 and Supp. While courts have found the necessary nexus if the defendant was seen at his house just before going to the sale, *United States v. Valenzuela,* 596 F.2d 824 (9th Cir.1979), and when a defendant's home had previously been found with drugs in it and the alleged transaction took place near the home, *United States v. Stefanson,* 648 F.2d 1231 (9th Cir.1981), none of these factors is present here. Without more than merely the statement in the affidavit that Defendant Needelman has committed a drug offense the Court cannot find that there was adequate probable cause to support issuance of the warrant to search his house. *United States v. Flanagan,* 423 F.2d 745, 747 (5th Cir.1970). The items found there must be suppressed.

### B. The Wong Sun Issues

The attack upon the warrants here is directed at the contents of the January 12, 1984, affidavit of Agent-In-Charge Fassler which supported the application for the warrants. Defendants urge that the warrants are tainted for three reasons. First, they assert that DEA Agent Steadman deliberately opened the mouth of the brown paper bag and looked into it during the period between the time it was placed on top of the car by Needelman in response to the directions of Agent Cunniff and the time that it was picked up and closed by Agent Lear. Second, Defendants challenge the testimony of Agent Lear, reflected in Agent Fassler's affidavit, that before closing the mouth of the bag, as it lay on the top of the car, and picking it up, he could look into it and see white envelopes of the type into which he knew the money given to the informant Anderson had been placed. Finally, Defendants assert that the affidavit improperly contained reference to a statement made to Fassler by Cunniff that while the bag was on the top of the

---

**5.** The vehicle was impounded or seized at the time of Defendant Needelman's arrest. The only search of its interior was done pursuant to a limited consensual search by Detective Ser-

geant Cole to secure for safekeeping a gold bar in the car's glove compartment about which the Defendant expressed concern. No challenge is made to this limited search.

car he saw in it, in plain view, white envelopes and a $100 bill, visible through the glassine window of the top envelope. Currency had been given to Anderson in envelopes like those seen by Cunniff.

### 1. Steadman's Alleged Conduct

In deciding whether to suppress the evidence seized and searched pursuant to warrants in this case, the Court must assess Agent Steadman's alleged conduct in two respects: (1) as it directly affects the validity of the warrant; and (2) as it affects the plain view observations of the other officers and thus indirectly affects the warrant. In order to determine the direct effect of his conduct on the warrant, the Court does not find it necessary to decide whether Agent Steadman looked into the bag in question, and, if he did so, whether that action was illegal. As the Supreme Court stated in *Wong Sun*, the question to be asked is "whether granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) (*quoting* McGuire, *Evidence of Guilt* 221 (1959)). In the recent case of *Segura v. United States*, —— U.S. ——, 104 S.Ct. 3380, 82 L.Ed.2d 599 (July 5, 1984), the Supreme Court reaffirmed *Wong Sun* and the independent source doctrine first enunciated in *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), stating:

> whether the initial entry was illegal or not is irrelevant to the admissibility of the challenged evidence because there was an independent source for the warrant under which the evidence was seized. Exclusion of evidence as derivative or "fruit of the poisonous tree" is

not warranted here because of that independent source.
*Id.* at 5133.

■ The evidence challenged here was obtained by warrant. Even if Agent Steadman looked in the bag, the record contains no indication that he related to any other agent what, if anything, he saw in the bag. Nor can any such relay of information be fairly inferred from the evidence now before the Court. Therefore, *if* any knowledge were obtained by police misconduct, it was not a factor in the officers' decision to seek a warrant. Moreover, if Agent Steadman looked in the bag and saw anything, that information was not set out in the affidavits, including that of Agent Fassler, and the record does not indicate that it was communicated to the magistrate in any other way. Therefore, the information, if any, was not used in an effort to get the warrant and could not have contributed to the magistrate's decision to issue the warrant. The warrant, if valid, is then an independent source for discovery of the contents of the bag.

The alleged opening of the bag by Agent Steadman has another, indirect, potential consequence, however, which requires resolution of the factual question of whether Agent Steadman did in fact open the bag and look into it as it lay on top of the Needelman car before it was seized and closed by Agent Lear. If Agent Steadman did open and look into the bag before Agent Lear seized it, Agent Lear's observation of white envelopes in the bag may not be a legitimate "plain view" observation. This is so because the conduct of Agent Steadman, a law enforcement officer, may have caused the mouth of the bag to be open, thereby making possible Agent Lear's observation of its contents. If the search of the bag at that time without a search warrant was legally impermissible, a question the Court does not decide,[6] then

**6.** The issue of whether the brown paper bag could legitimately have been searched without a warrant as incident to the Defendant Needelman's arrest would depend on whether there was a legitimate exigency excusing the officers from the requirement that they get a search warrant from a neutral magistrate once the bag had been seized. *See Coolidge v. New Hamp-* shire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *United States v. Bautista*, 731 F.2d 97 (1st Cir.1984); *United States v. Irizarry*, 673 F.2d 554 (1st Cir.1982); *see also New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *United States*

Agent Lear's observations of the contents of the bag would be "tainted" under *Wong Sun* because those observations were made possible by the prior conduct of Agent Steadman in improperly opening the bag for purposes of a visual search. Agent Lear had "no idea" how the bag came to be open at the mouth when he looked into it. Tr. at 48–49.

The Court finds as a fact, however, that Agent Steadman did not open and look into the bag at any time prior to Agent Lear's seizure of it. The evidence on this issue consists of the testimony of Agent Cunniff, who testified that Agent Steadman did not open and look into the bag; that of Agent Lear, who testified that he did not see Agent Steadman do so; and of the witness Amundsen and of Defendant Needelman, both of whom testified that Steadman did open the bag and look into it. Agent Steadman was not called as a witness at the hearing. The other law enforcement officers present at the scene of the arrest, Officer York and Detective Sergeant Cole, did not testify. The Court indulges in no speculation as to the reasons for the absence of their testimony.

The Court's principal reason for rejecting the testimony of the witness Amundsen and of Defendant Needelman as to Agent Steadman's alleged conduct in opening the bag is that the Court finds from all the evidence that Agent Steadman did not arrive at the scene of the arrest until *after* Agent Lear had arrived and seized the brown paper bag. Thus, Agent Steadman had no opportunity to open or look into the bag prior to Agent Lear's seizure of it; it would have been impossible for him to have done so. Further, the Court finds from the evidence that no one looked into the bag

after Agent Lear seized it until the search warrant for it was executed.

The testimony establishes that at least seven officers in four cars were in the Westbrook Mall parking lot surveilling the meeting of Defendants Needelman and Kenney. Agent Cunniff and Officer York were in Agent Cunniff's car. Agent Cunniff's car was black in color. Tr. at 167. Agent Steadman and Officer Joel Barnes, Tr. at 42, were in Steadman's car, a white-colored vehicle. Tr. at 169. Agent Lear and Detective Sergeant Cole were in a third, blue, car. Tr. at 168.[7]

When Defendant Needelman exited from Defendant Kenney's car after they had met, Agent Lear instructed the officers in the Steadman car by radio to follow the Kenney car as it drove away, keeping it "under surveillance." Tr. at 32, 43. At the same time he instructed the officers in the Cunniff car to shadow Needelman as he walked across the parking lot and to apprehend him if he tried to enter any vehicle. Tr. at 33. His reason for this instruction was that he did not want "a chase." *Id.* The officers carried out these instructions.

Agent Lear watched Needelman walk toward a blue Volvo parked in the lot, Tr. at 32–33, and saw Agent Cunniff approach Defendant Needelman and arrest him. Tr. at 33–34. Agent Lear then drove his car to the area of the blue Volvo. Tr. at 47, 63. At the time that Defendant Needelman appeared to be about to enter a car, Agent Lear radioed Agent Steadman to arrest Defendant Kenney. Tr. at 43. He waited until then to give that order because he wanted to see "what Mr. Needelman was going to do." *Id.* Lear exited the car on the right of the Needelman car, approached

---

*v. Fleming,* 677 F.2d 602 (7th Cir.1982). The Government so argues in brief.

It is apparent, however, that Agent Lear treated the brown paper bag, once seized, as requiring a search warrant before its contents could be examined. The Court's ultimate conclusion herein is that he was successful in that respect and that no search of the bag's interior, other than the "plain view" observations of him and Agent Cunniff occurred. Agent Lear's observations are found to be legitimate "plain view"

observations and Agent Cunniff's observations, if they occurred, are found not to be material to the Magistrate's finding of probable cause. Thus, there is no need to address the issue of whether the bag could legitimately have been searched without a warrant.

7. There was also another car, occupied by an Officer Russo, that was "part of the surveillance that stayed with Mr. Kenney." Tr. at 69–70.

it from that side, walked to its rear, Tr. at 47, and picked up the brown paper bag off the top of the Needelman car. Tr. at 48. Agent Cunniff testified that the arrest procedures took "probably a couple of minutes." Tr. at 94. Agent Lear said no one looked into the bag after he took it off the roof of the car. Tr. at 53. To Lear's knowledge, only he and Agent Cunniff looked into the bag prior to that time. *Id.* Lear knew that Agent Cunniff had done so only because Cunniff later told him so. Tr. at 54, 63, 64.

It is clear, and the Court finds, that at the time Agent Lear approached the Needelman car and picked up the brown paper bag that Steadman was not at the arrest scene. He had not yet returned to the parking lot from carrying out the arrest of Defendant Kenney. The Court deduces from this testimony that less than two minutes had then elapsed from Agent Lear's radio instruction to Agent Steadman to arrest Defendant Kenney. Agent Cunniff testified that Steadman did not come upon the arrest scene until after the arrest was completed. Tr. at 94. He appeared "[w]ithin a few minutes of the arrest." Tr. at 86. He was there before Defendant Needelman was taken away. Tr. at 87. He arrived after Agent Lear arrived at the scene. Tr. at 92. The Court further deduces that Agent Lear seized the bag while the arrest was being completed.

Agent Cunniff's testimony in these respects is fully supported and corroborated by Agent Lear's testimony concerning the movements of the parties in question from the time that Defendant Needelman exited Kenney's car to the time Agent Lear picked up the brown paper bag from the top of the Needelman car. It is clear that Agent Steadman was not present when the latter event occurred.

Agent Lear testified on June 20, 1984, that he was not sure when Agent Steadman arrived, "but I would guess that it would have been after the arrest of Mr. Kenney." Tr. at 46–47. He recalls Agent Steadman coming to the scene before Defendant Needelman was taken away. Tr. at 53. Agent Steadman did not look in the bag because Agent Lear "had the bag in

my hand." *Id.* In his testimony on June 25, 1984, Agent Lear said that as far as he knew none of the agents or officers opened the brown paper bag. Tr. at 167. Lear said Agent Cunniff, accompanied by Officer York arrived first at the arrest scene and that Lear arrived next. Tr. at 167. Steadman came to the arrest scene after Kenney had been arrested. Tr. at 169. The bag was no longer on the top of the car at the time of his arrival. *Id.* Lear had taken the bag from the top of the car "when I [Lear] arrived at the arrest site." *Id.* Agent Lear was at the arrest site before Agent Steadman got there. *Id.* Agent Steadman never touched the bag. *Id.*

The Court rejects for lack of credibility the competing versions of the events pertinent to this issue as given by the Defendant Needelman and the witness Amundsen. The gist of Defendant Needelman's testimony on the point is as follows:

Q And did anybody do anything with regard to the paper bag?

A Well, while he was reading me my rights and he stopped and started kicking me in the feet because he said my feet weren't far enough apart. I had obviously never been arrested before because I didn't know the procedure, and then he started to read the rights again and a man showed up with an L.L. Bean jacket with a hat that looked like a duck hunter's hat to me with ear flaps and he came over to me and leaned over and started to open up the bag and then indeed did open up the bag and looked inside and made some comment about, "Look, you can even see the envelopes," and about that time the man who was with the gun, who I later learned was Michael Cunniff, I believe, reached over and pushed the man out of the way and said something like, "Not yet, you dope," or something like that, and at that point he continued to read me my rights.

Q And is that how the bag got opened because an agent opened the bag?

A Yes, sir.

Q Do you know who that agent is?

A I do not know who it is. I believe it would be Mr. Steadman but I don't know. I haven't seen the man since and I'm not sure that I could identify him, but that's how the bag was opened.

Q At any rate, the bag was closed until the agent opened it, whoever he was?

A That's right.

Tr. at 206–07. This testimony is completely at variance with the testimony of Agent Lear on the point, which the Court finds to be internally consistent and completely credible. It is also inconsistent with that of Agent Cunniff, whose testimony on the point is fully corroborated by that of Agent Lear. The Court finds that Defendant Needelman's testimony with respect to this issue is unbelievable.

The testimony of the witness Amundsen tracks the content of the Defendant Needelman's testimony. It is afflicted by a very significant factual weakness. He states:

Q Then what occurred?

A Then I saw this *white* vehicle come up rather rapidly. This gentleman comes out with a gun and I was, you know, "Holy mackeral!" [sic]. Also, there was a girl with him, I believe. I am not sure. It might have been a blonde. She got out, also, but I saw him—one of those deals like on T.V. (indicating). And all of a sudden he had his hands up like this. (Indicating.)

Tr. at 136 (emphasis added). The "gentleman" referred to was clearly Agent Cunniff. All of the other testimony in the case agrees that he was the arresting officer at the scene. The evidence shows that only he drew a gun. Yet, the witness claims to have seen Agent Cunniff get out of a *white* car. The only evidence in the case on the point establishes that Agent Cunniff was in a *black* car. Tr. at 167. It was Agent Steadman who had the white car. Tr. at 169. Clearly, this witness is in error in

testifying to observations made in the initial arrest procedures while a white car was present. Only Agent Steadman had a car of that color and the evidence is clear beyond question that he did not arrive until after Lear had arrived, the arrest had been completed, and the bag seized by Lear. This element of Amundsen's testimony is critical and discredits the remainder of his testimony, especially in view of the almost total absence of any clear recollection of specific details of the events which he viewed, the close alignment of the content of his testimony with that of the Defendant Needelman, and his rather long and close friendship with the Defendant Needelman. The Court concludes from all of the evidence, after having studied Amundsen's testimony closely, that this testimony is fabricated.

Accordingly, on the foregoing analysis the Court finds that Agent Steadman at no time during the arrest procedure opened, touched or looked into the brown paper bag prior to its being seized by Agent Lear. No such conduct having occurred, no "taint" could be, or was, created with respect to Agent Lear's observation of white envelopes in the brown paper bag or the recital of that observation in his affidavit of January 23, 1984.

*2. Agent Lear's Observation of the Interior of the Brown Paper Bag*

■ Defendants cannot succeed on their claim that DEA Agent Lear's observation of white envelopes in the brown paper bag, recorded in his affidavit dated January 23, 1984, tainted the search warrant for the brown paper bag. The language in question in the Lear affidavit is the following:

At the time of Needelman's arrest I walked behind Needelman's automobile and observed a brown paper bag on top which was partially open. I could observe white envelopes inside the brown paper bag. S/A [Special Agent] Cunniff advised me that he had told Needelman to place the bag on top of the automobile at the time he placed Mark Needelman under arrest.

Affidavit of Dale E. Lear dated January 23, 1984, at ¶ 6. The affidavit also states that Agent Lear:

> was present when Det. Sgt. Douglas Cole placed $61,000.00 to be used to purchase a kilogram of cocaine, into 13 white envelopes. I was present when Det. Sgt. Cole put the envelopes containing the $61,000 into a brown vinyl briefcase owned by the informant James Anderson.

*Id.*

At the hearing Agent Lear described the position of his car in relation to that of Defendant Needelman. He testified that he got out of his car and seized the bag from the top of the Needelman car, where it lay just to the right of Needelman's right hand as Needelman stood braced against the right side of the car at the driver's door. Agent Lear further testified that the bag lay with its open mouth facing the rear of the car and that as he approached the car from the rear and reached up to seize the bag, he looked in and saw white Casco Bank envelopes with a glassine window. The envelopes were like those that Lear knew contained the money given to informant Anderson earlier in the day. Tr. at 34, 35, 48, 49, 60. Lear testified that in seizing the bag, he grasped its open end and closed it. He then kept it in his possession and did not look into it before turning it over to Agent-in-Charge Fassler later that day. *Id.* at 35, 56, 62–63. He observed Fassler place the bag in the evidence locker without looking inside of it. There is no evidence that any officer looked into the interior of the bag thereafter until after the search warrant authorizing the search of the bag was executed by the officers.

Agent Lear was a thoroughly credible witness. He was clearly the most legally sophisticated officer present at the scene of the arrest. His conduct at the scene of the arrest displays a fastidious concern for compliance with legal requirements in the course of the arrest procedure and reflects a sincere and effective effort to assure such compliance both by himself and his fellow agents. As a witness, he was thoughtful, deliberate and candid. His recall of events was generally clear and unselective. If he did not know the answer to a question, he said so without hesitation. He did not engage in any surmise or speculation in framing his answers.

The Court accepts as accurate and credible Agent Lear's testimony describing what he observed at the scene of the arrest, and his knowledge of the handling of the bag after its seizure. The Court, therefore, finds that the bag was in the position described by Lear, on the top of the car with its open mouth facing the rear of the car as Agent Lear passed by it. The bag was in the position where it was placed by Defendant Needelman when Needelman was apprehended by Agent Cunniff. No law enforcement officer had opened the bag or looked into it other than Agent Lear when he picked it up. The Court further finds that as Lear approached the bag, the white envelopes in the bag were in his "plain view," and that he saw them at that time and recognized them as similar to the envelopes in which the money given Anderson had previously been placed.

■ The contents of an open package in "plain view" of an officer acting lawfully are not the product of an unreasonable search. *Arkansas v. Sanders,* 442 U.S. 753, 764, n. 13, 99 S.Ct. 2586, 2593, n. 13, 61 L.Ed.2d 235 (1979); *see also Ross v. United States,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). When an officer inadvertently comes across and recognizes as evidence items in plain view at the scene of a lawful arrest, the Fourth Amendment does not prevent the seizure of that evidence. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Therefore, plain view evidence is not subject to suppression in the absence of misconduct by the discovering officers.

No evidence before the Court indicates that Agent Lear's observation and seizure of the bag was in any way the product of misconduct on his part, and the Court has found that no misconduct occurred on the part of Agent Steadman contributing to his observations and seizure of the bag. The Court finds no contributing misconduct on

the part of Agent Cunniff at the scene of the arrest. Therefore, Agent Lear's observations of the white envelopes inside the bag and his recognition of them as the same type previously used to package the money given to Anderson are properly utilizable as evidence in this matter, just as any other legally obtained evidence would be.

Since Agent Lear's observations and conclusions were lawfully made, their recitation in paragraph 6 of his affidavit of January 23, 1984, does not taint that affidavit or the search warrant issued in partial reliance on its contents.[8]

### C. The Seizure of Items From Defendant Needelman's Safe Deposit Box

■ In January the DEA also obtained warrants to search safe deposit boxes belonging to Defendant Needelman for "cocaine or other controlled substances, drug paraphernalia, records of illegal transactions, money, monetary instruments, materials and/or other valuables derived from the illegal trafficking of [sic]· controlled substances and other evidence and instrumentalities of the crime of conspiracy to possess" cocaine. Seized in the searches of the safe deposit boxes were a large quantity of cash, quantities of gold and silver in coins, bars and medallions, and various items of jewelry. Defendant Needelman now seeks to suppress these items on the ground that "the Government has failed to establish any nexus between such evidence seized and the alleged criminal activities as set forth in the Indictment or probable cause to justify the continued retention of the Defendant's property." Defendant Needelman's Motion to Suppress Pursuant to Fed.R.Crim.P. 41, paragraph 6.

As has been demonstrated above, the affidavit of Agent Fassler, which is incorporated in the application for the warrants challenged here, provides ample basis for a finding of probable cause that Defendant Needelman was engaged in trafficking in

illegal drugs. Moreover, Agent Lear's affidavit presented in support of the warrant also stated that "based on my experience in investigating narcotics violations and conspiracies, I have learned that large-scale narcotics traffickers frequently obtain safe deposit boxes in storing their drugs, etc." As the Court had occasion to state recently in *United States of America v. Kenney,* Criminal No. 84–00008–02 (D.Me. May 10, 1984):

> It is too well known to be doubted that large amounts of cash are generated by such activity. It may be validly presumed, because such amounts of cash are generated by illegal activity, that those in possession of cash so generated will not deposit it in bank accounts or other legal forms of safekeeping where it will leave a "paper trail." Possession of cash in large amounts may tend, in conjunction with other evidence, to show a person's participation in illegal drug trafficking. As such, it is relevant evidence of such activity.

*Id.* at 3–4 (*citing United States v. Ariza-Ibarra,* 605 F.2d 1216, 1224–25 (1st Cir. 1976), *cert. denied* 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981)). There was, therefore, probable cause to search Defendant Needelman's safety deposit boxes for drugs or money that might have been derived from illegal trafficking in drugs. The gold, silver and jewelry were discovered in plain view of the officers while they conducted this lawful search and are not, therefore, the product of an illegal search.

■ The next question raised by Defendant's motion is whether there was probable cause for the seizure of the items in the safe deposit boxes. Defendants argue that there is no probable cause to believe that either the money or the jewelry are in any way connected with the case. As the opinion in *Kenney* pointed out, the relationship between illegal drug trafficking and large amounts of cash secreted in places like safety deposit boxes, where they will not

---

**8.** The observations of Lear in question were made available to the Magistrate only by paragraph 6 of his affidavit of January 23, 1984.

They are not set out as observations of his in the Fassler affidavit and are not mentioned in Lear's affidavit of January 13, 1984.

be subject to tracing, is well established. Therefore, there is probable cause to believe that the money was either evidence of or fruit of the offense of drug trafficking, and the seizure by the DEA of the cash in Needelman's safe deposit box is lawful.

■ The seizure of the gold, silver and jewelry is more problematic. In order for the Government to seize and use in evidence items such as these, which were found in plain view by officers conducting a lawful search, the Government must demonstrate a nexus between the items seized and the alleged criminal activities. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). "Of course, the extension of the original justification is legitimate only where it is apparent to the police that they have evidence before them." *Id.* at 466, 91 S.Ct. at 2038. Although items such as gold, silver and jewelry are, in certain respects, cash equivalents, neither the affidavit before the Magistrate nor the record before this Court shows that they are commonly used as currency in drug deals or that drug dealers commonly convert their ill-gotten cash into these as cash equivalents. While it would be unusual to keep cash in a safe deposit box when it might be earning interest in a regular account, gold, silver and jewelry are frequently kept in such boxes by perfectly law-abiding citizens for safekeeping and/or in anticipation of their appreciation on the open market. Since the requisite connection between Defendant Needelman's alleged drug dealing and the gold, silver and jewelry seized from his safety deposit boxes has not been shown, there was no probable cause for seizure of those items, and they must be returned to him.

■ Finally, relying on *United States v. Premises Known as 608 Taylor Ave.*, 584 F.2d 1297 (3d Cir.1978), Defendant Needelman suggests that the cash found in the safe deposit box should be returned because it has been retained for an unreasonable amount of time and its evidentiary value may be maintained through documentation. The Court disagrees. The Government here instituted prosecution shortly after the seizure of items whose return is sought, and trial will commence in less than two weeks. This is in sharp contrast to the situation in *608 Taylor Ave.*, where no proceedings against defendant had been commenced and retention of the seized property for an indefinite period seemed likely. This Court cannot find unreasonable the Government's retention of the seized cash during the period awaiting trial. Retention of the cash itself is the best way of preserving the evidence for trial and, in the restricted period with which we are dealing, no substitute method is necessary.

D. *The Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), Issue Concerning Allegedly False Statements Made by Agent Cunniff to Agent Fassler as to His Observations of the Interior and Contents of the Brown Paper Bag*

As this Court noted in its decision on the *Franks* issue in the *Field* case, *United States v. Field*, Crim.No. 84–00008–02, (D.Me. May 11, 1984), it is appropriate in adjudicating *Franks* issues to bear particularly in mind the concluding paragraph of the opinion in that case, wherein the Court very deliberately and specifically set out a distillation of its holding. It is there stated:

In sum, and to repeat with some embellishment what we stated at the beginning of this opinion: There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. *To mandate an evidentiary* hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of *deliberate* falsehood or of *reckless disregard for the truth,* and those allegations must be accompanied by an *offer of proof.* They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of neg-

ligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, *not of any nongovernmental informant.* Finally, if these requirements are met and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

*Franks v. Delaware,* 438 U.S. at 171–72, 98 S.Ct. at 2684–85. (emphasis added).

 The Court concludes, for reasons set forth below, that the Defendants have sufficiently alleged that Agent Cunniff's statement set forth in paragraph 17 of the Fassler affidavit are false and that those statements were made by Agent Cunniff to Agent Fassler with a reckless disregard for the truth.[9] The Court is satisfied from the offer of proof that the allegations are not merely of falsehood that is the result of negligence or innocent mistake. Further, the Court concludes that the making of such statements by Agent Cunniff to Agent Fassler, and Agent Fassler's incorporation of them into his affidavit to be used for the purposes of obtaining various search warrants, falls within the scope of the Court's ruling in *Franks* because Agent Cunniff is not "a nongovernmental informant." *Franks,* 438 U.S. at 171, 98 S.Ct. at 2684. Thus, his knowledge is attributable to Agent-in-Charge Fassler. *See Whiteley v. Warden,* 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971); *United States v. Rule,* 594 F.Supp. 1223 at 1239 (D.Me. Sept. 18, 1984). Hence, the critical factor in the Court's analysis is whether, "when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause." *Franks,* 438 U.S. 171–172, 98 S.Ct. at 2684–85.

The Court is satisfied that the showing of the possible falsity of Cunniff's statements made at the suppression hearing would be great enough to warrant further inquiry if their materiality is shown. Paragraph 17 of Agent Fassler's affidavit states that:

Special Agent Michael Cunniff of the Drug Enforcement Administration approached Needelman, instructed him to put the brown paper bag on the roof of the Volvo and placed Needelman under arrest. As Needelman complied with S/A Cunniff's instruction, S/A Cunniff observed through the open paper bag what appeared to him to be white envelopes, similar to those used by Det. Sgt. Cole to package the money Anderson gave to Kenney. S/A Cunniff also saw inside the bag, through one of the envelopes, what appeared to him to be a $100 bill.

Defendants contend that Cunniff's two recited observations, that he saw white envelopes and that he saw what looked like a $100 bill, are false.

According to Cunniff's testimony at the suppression hearing, when he approached Needelman to arrest him, Needelman put the bag on the top of the car so that the long side of the bag was flat on the car's roof. The bag, stated Cunniff, was "toward the back of the car, to the right of the car as you face the driver's side door." Tr. at 92. Cunniff said he was standing to the right of Needelman and saw the bag between the time the bag was placed on the roof and the point at which Agent Lear picked it up. Agent Lear has testified that he arrived and stood briefly to Agent Cunniff's right. He said that he did not see into the bag from his position there but did see inside when he walked by the back of the car. He said he could see no money in the bag from his position. The apparent conflict in the description of the two DEA

---

**9.** Additionally, Defendants claim in their memorandum filed on July 12 that paragraphs 3, 8, 9 and 10 of the Fassler affidavit contain false information. The arguments there made are precisely those made and decided by the Court in the *Field* case as to the contents of those paragraphs of the affidavit. The Court adopts its Memorandum of Decision on Motion of Defendants for a *Franks v. Delaware* Hearing in the *Field* case as dispositive of the issue so raised here. *United States v. Field,* Criminal No. 84–00008–02–P, (D.Me. May 11, 1984).

agents' positions when they each say they saw into the bag generates the need for further inquiry. Thus, Defendants' allegation of falsity is substantial enough to meet the *Franks* requirement.

Agent Cunniff is a trained law enforcement officer whose observational skills are an important part of his professional qualifications. Either he saw into the bag or he did not. *If* his statements are false, that falsity is highly likely to be intentional or made with reckless disregard for the truth since a trained police officer would be likely to take the accuracy of his observations seriously. Therefore, Defendants' allegation that the alleged falsity was made intentionally or with reckless disregard for the truth is also substantial enough to meet the *Franks* requirement.

Although Defendants' allegations raise the *Franks* issue, the Court concludes that no hearing is necessary. The Supreme Court stated in *Franks:*

> Finally, if these requirements are met and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

*Franks v. Delaware,* 438 U.S. at 171–72, 98 S.Ct. at 2684–85.

Neither Agent Cunniff's statement that he saw white envelopes nor his observation of what appeared to be a $100 bill in the envelope was material to the Magistrate's determination of probable cause. The significance of the brown paper bag as a probable instrumentality of the drug transaction sketched out in the Fassler affidavit was well established in that affidavit by the facts that (1) Kenney put the money given to him by Anderson to buy cocaine in a brown paper bag, and (2) Kenney customarily used brown paper bags for carrying money in drug deals. Needelman's possession of the brown paper bag, regardless of what was *known* to be in it, under all the circumstances disclosed by the Fassler affidavit was sufficient by itself to constitute a valid showing of probable cause. This showing of probable cause is bolstered in

the case of the warrants issued on January 23, 1984, by Agent Lear's affidavit reciting his plain view observation in the bag of envelopes similar to those in which the money was given to Anderson. The Court finds, therefore, that probable cause to search the bag was established by the portions of the Fassler affidavit remaining after excision of Cunniff's alleged misstatements. Moreover, the information concerning the envelopes was duplicative of information legitimately and independently provided in Agent Lear's affidavit of January 23, 1984.

The observation that Cunniff saw what appeared to be a $100 bill in one of the envelopes has no particular evidentiary significance for the determination of probable cause on the face of the affidavits, for nowhere is it stated in any of the affidavits that the money given to Anderson was in $100 denominations. Since the affidavits show probable cause to search the bag, even when the material that is the subject of the alleged falsity is set to one side, no hearing is required under *Franks.*

### IV. Order

Accordingly, it is ORDERED that:

(1) Defendant Needelman's motion to suppress the fruits of the search of the apartment of Earleen Mitchell at 757 Main Street, Apartment 29, South Portland, is GRANTED; all evidence seized as the result of said search is hereby SUPPRESSED from use at trial against Defendant Needelman;

(2) Defendant Needelman's motion to suppress the seizure of gold, silver and jewelry from his safe deposit box # 64, Casco Northern Bank, is hereby GRANTED; the Government shall return those items forthwith to Defendant Needelman;

(3) In all other respects, Defendants' motions to suppress are DENIED.

(4) Defendants' motion for a *Franks* hearing is DENIED.

So ORDERED.