UNITED STATES of America, Appellee,

v.

John Jeffrey SOULE, Defendant, Appellant.

No. 89–1568.

United States Court of Appeals, First Circuit.

Heard Jan. 8, 1990.

Decided July 13, 1990.

Brian J. McMenimen, with whom Richard A. Gargiulo and Gargiulo, Rudnick & Gargiulo, Boston, Mass., were on brief, for defendant, appellant.

R.J. Cinquegrana, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., was on brief, for U.S.

Before BOWNES, BREYER and CYR, Circuit Judges.

CYR, Circuit Judge.

John Jeffrey Soule tendered a conditional plea to several federal drug charges after reserving a right to appeal[1] the district court order rejecting his motion to suppress approximately one pound of cocaine, more than three-quarters of a ton of marijuana, and nearly one million dollars in cash discovered and seized pursuant to a search warrant issued by a Massachusetts court. All of defendant's contentions on appeal target the state court search warrant.

The first in a succession of events crucial to the validity of the state court warrant

1. *See* Fed.R.Crim.P. 11(a)(2).

was the investigatory stop of a pick-up truck operated by co-defendant James Cline as it departed the residence of defendant's mother just after 9:30 p.m. on the evening of July 23, 1988. In the early morning hours of the following day, a clerk magistrate of the Hingham District Court issued three search warrants based in part on information obtained as a result of the investigatory stop.[2]

Thus, our otherwise straightforward discussion on the sufficiency of the search warrant begins by setting the stage for the stop.

## I

## FACTS

Three days before the police stopped the pick-up truck as it left 255 Broadway, Special Agent Alan Lively of the Drug Enforcement Administration ("DEA") telephoned the Hanover Police Department with a tip from a confidential informant about an impending marijuana shipment in the approximate amount of 1500 pounds to Jeffrey Soule, a/k/a "Hanover Jeff." Agent Lively told Hanover Police Lieutenant Paul Hayes that the marijuana was to be delivered in a Ford F–250 pick-up truck, copper in color, with chrome "mag" wheels and a "cap" over its load bed. Lieutenant Hayes determined that John Jeffrey Soule had been arrested on a drug possession charge about a decade earlier in Hanover. The next day Agent Lively advised Lieutenant Hayes that the license plate on the pick-up truck was "Ohio N3872B." Detective Thomas Hayes, brother of Lieutenant Paul Hayes, began intermittent surveillance at 255 Broadway.[3]

At about 5:30 p.m. on the following day, July 23, Detective Hayes saw the Ford F–250 pick-up truck, copper in color, bearing Ohio plate N3872B, at 255 Broadway, and began constant surveillance of the premises. At about 8:05 p.m. that evening Detective Hayes saw the defendant emerge from the house, and drive the pick-up truck off the driveway and across the lawn to the back of the house. Detective Hayes instructed Patrolman David Tyrie to maintain surveillance of the premises and to stop the pick-up if it left 255 Broadway. Detective Hayes then took up surveillance at a different vantage point, from which he was able to observe that the pick-up had been backed up to a pedestrian doorway at the rear of the two-story garage attached to the house. Detective Hayes observed movement inside the garage, then returned to the police station. At about 8:45 p.m. he called Lieutenant Hayes.

Patrolman Tyrie saw the pick-up leave 255 Broadway at 9:32 p.m. After following the pick-up for about a quarter of a mile, Tyrie stopped it and immediately notified Detective Hayes. Tyrie noticed that the driver appeared very nervous. Upon request, the driver produced an operator's license in the name of "Robert Terry," Lexington, Kentucky. Although neither Tyrie nor any other Hanover police officer knew it at the time, the driver was none other than co-defendant James Cline. *See supra* note 3.

Tyrie detected a slight odor of alcohol on Cline's breath. Cline admitted to having had a few drinks. Detective Hayes soon arrived and asked Cline to perform two sobriety tests. The officers observed that Cline was somewhat unsteady on his feet and that his eyes were slightly glassy. The door on the driver's side of the pick-up was left open as Cline stepped out to perform the sobriety tests, and both officers saw a hand-rolled marijuana "roach" in open view on the floor below the driver's

2. The appeal implicates only the warrant to search the premises located at 255 Broadway in Hanover, Massachusetts, belonging to defendant's mother.

The jurisdiction of the Hingham District Court includes Hanover.

3. On July 22, at about 5:30 p.m., Detective Hayes saw an automobile in the driveway at 255 Broadway, bearing a Kentucky license plate. A record check disclosed that it was registered to Robert Terry, 167 North Limestone, # 15, Lexington, Kentucky. The Kentucky Registry of Motor Vehicles had no driver's license information on file under the name of Robert Terry. Unbeknownst to any of the Hanover police officers at the time, "Robert Terry" was an alias used by co-defendant James Cline.

seat. When asked about the marijuana roach, Cline denied having known that it was there, explaining that the pick-up belonged to a friend. At this point Detective Hayes walked alongside the cab of the pick-up and observed through a window that the load bed was empty. Hayes then opened the door at the back of the pick-up and immediately detected a strong odor of marijuana. After directing Cline to remain in the pick-up, the officers called the station to let Lieutenant Hayes know what had transpired. Lieutenant Hayes was on the telephone with Agent Lively, who requested that the driver of the pick-up be detained while Lively attempted to obtain information concerning the identity of "Robert Terry."

Agent Lively's telephone records reflect that he first called the Hanover Police Department at 9:45 p.m. (eight minutes). At 10:10 p.m. he again called Hanover (three minutes), with the information that "Robert Terry" was an alias used by James Cline, a fugitive from Florida wanted on a federal warrant for conspiracy to possess, with intent to distribute, marijuana. Agent Lively knew that James Cline was under indictment in Louisiana in connection with an importation of 200,000 pounds of marijuana. Cline was arrested. At 10:14 p.m. a tow truck was called to haul the pick-up. The arrest was called in to the police station at 10:17 p.m. At 10:30 p.m. Cline was booked at the police station on state charges for possession of marijuana and as a fugitive from justice. Cline is not a party to the present appeal.

## II

## DISCUSSION

Defendant Soule successively asserts on appeal that the police illegally initiated and extended the investigatory stop of the pick-up truck; all evidence obtained during the stop was unconstitutionally acquired; the untainted evidential content of the affidavit would not support probable cause to search the premises at 255 Broadway; the search warrant was invalid; the premises search violated appellant's fourth amendment rights; ergo, the evidence seized under the search warrant must be suppressed. Reasoning to the same conclusion on alternate premises, defendant contends that the state court search warrant was obtained in violation of Federal Rule of Criminal Procedure 41(a) because it was issued (i) by a clerk magistrate, rather than a state court judge; (ii) in connection with a federal prosecution. Finally, from the third quiver defendant urges us to draw upon the comparatively rigorous probable cause requirements of Massachusetts law to test the state court warrant issued on the strength of the affidavit of a state law enforcement officer in a joint federal-state criminal investigation. The district court either rejected or mooted each of these contentions by determining the investigatory stop and detention lawful and the search warrant valid under both federal and state law.

### A. Defendant's Expectation of Privacy in Pick-up

■ Soule insists that the investigatory stop of the pick-up truck was unconstitutional because it was initiated without reasonable suspicion and lasted longer than any stop ever countenanced by the courts. Nevertheless, under the recognized rule that the proponent of a motion to suppress must establish not only the unlawfulness of the challenged governmental action, but that it intruded upon some legitimate expectation of privacy *of the proponent, see, e.g., Rawlings v. Kentucky,* 448 U.S. 98, 104–05, 100 S.Ct. 2556, 2561–62, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois,* 439 U.S. 128, 131 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387 (1978), we must note at the outset the utter absence of any evidence, inference or suggestion that the *Terry* stop, *see Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), infringed any legitimate expectation of privacy on the part of the defendant.[4]

4. A joint suppression motion was filed by the defendant and codefendant Cline. Although the government vigorously opposed defendant Soule's right to challenge the *Terry* stop, the issue eluded consideration by the district court. Instead, the district court elected to consider,

*Rakas v. Illinois,* 439 U.S. at 131 n. 1, 99 S.Ct. at 424 n. 1, makes clear beyond question that "[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." [5] *Rakas* reaffirmed the rule in *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969): "Fourth Amendment rights are personal rights which ... may not be vicariously asserted." 439 U.S. at 133–34, 99 S.Ct. at 425. The *Rakas* defendants had urged adoption of the so-called "target" theory of "standing," on the strength of the language, taken out of context from *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), that any "one against whom the search was directed" should be accorded "standing," *id.* at 261, 80 S.Ct. at 731. *Rakas* rejected the "target" theory, *Rakas,* 439 U.S. at 132–38, 99 S.Ct. at 424–28, and it did much more.

*Rakas* discarded the *Jones* formula for "standing" as well, which turned on whether the defendant was "legitimately on the premises," *Jones,* 362 U.S. at 267, 80 S.Ct. at 734, because the Court concluded that the *Jones* formula did "not answer the question whether the search violated a defendant's 'reasonable expectation of freedom from governmental intrusion,'" *Rakas,* 439 U.S. at 147, n. 14, 99 S.Ct. at 432, n. 14 (quoting *Mancusi v. DeForte,* 392 U.S. 364, 368, 88 S.Ct. 2120, 2123, 20 L.Ed.2d 1154 (1968)). Finally, *Rakas* reformulated the "standing" inquiry as a matter of substantive fourth amendment law.

> [T]he question is whether the challenged search and seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it. That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect. We are under no illusion that by dispensing with the rubric of standing used in *Jones* [362 U.S. 257, 80 S.Ct. 725] we have rendered any simpler the determination of whether the proponent of a motion to suppress is entitled to contest the legality of a search and seizure. But by frankly recognizing that this aspect of the analysis belongs more properly under the heading of substantive Fourth Amendment doctrine than under the heading of standing, we think the decision of this issue will rest on sounder logical footing.

439 U.S. at 140, 99 S.Ct. at 429.

The analytic significance of the *Rakas* reformulation was clarified in *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), where the Court refused to permit suppression of illegal drugs which the owner had placed in a friend's purse, on the ground that the owner had not demonstrated a reasonable expectation of privacy in the purse.

> Prior to *Rakas,* petitioner might have been given 'standing' in such a case to challenge a 'search' that netted those drugs but probably would have lost his claim on the merits. After *Rakas,* the two inquiries merge into one: whether governmental officials violated any legitimate expectation of privacy held by petitioner.

and rejected, the *Terry* stop claim on its merits, without first determining whether the defendant had demonstrated a legitimate expectation of privacy in the pick-up. The district court did determine, however, that the defendant, who lived at 255 Broadway on weekends and kept clothing and other personal belongings there, had demonstrated a reasonable expectation of privacy in those premises. *See Minnesota v. Olson,* — U.S. —, 110 S.Ct. 1684, 1689, 109 L.Ed.2d 85 (1990) ("we think that society recognizes that [an overnight] houseguest has a legitimate expectation of privacy in his host's home").

5. The defendants in *Rakas* were passengers in an automobile being driven by its owner at the time it was stopped as a suspected getaway car. A search of the passenger compartment disclosed a sawed-off rifle and a box of shells. The government challenged defendants' "standing" because the defendants neither alleged nor evidenced any proprietary interest in the car, the rifle or the shells.

*Id.* at 106, 100 S.Ct. at 2562.[6]

The Supreme Court concluded in *Rakas* that whether the investigatory stop and search of the getaway vehicle violated any right of its owner-driver was a matter of no moment because mere "legitimate presence" on the part of the defendant passengers was insufficient to demonstrate that *their* fourth amendment rights had been violated. *Rakas,* 439 U.S. at 148–150, 99 S.Ct. at 433–434. Since Soule was nowhere near the pick-up truck at the time it was stopped, detained and searched, *id.* at 148, 99 S.Ct. at 433 ("legitimate presence" relevant, but not controlling), and there is no evidence that Soule had any proprietary or possessory interest either in the vehicle, *see id.*, or its contents, *see id.*, or any right to exclude others from the vehicle, *see id.* at 143 n. 12, 99 S.Ct. at 430 n. 12, it would be difficult to posit a clearer failure to demonstrate any legitimate expectation of privacy on the part of the defendant, either in the pick-up or its contents.[7]

B. "Derivative Standing"

The defendant nonetheless contends that it is of little consequence that the challenged investigatory stop and "search" affected no legitimate expectation of privacy on his part. What matters, we are told, is that the search warrant is subject to challenge by defendant Soule in any event, insofar as it issued on the strength of evidence obtained in violation of co-defendant Cline's constitutional rights.

The defendant cites *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), as support for the unsound assertion that the "gravaman (sic) of the fruits of the poisonous tree doctrine is that the tainted evidence cannot be used *at all.*" Appellant's Brief at 20 (emphasis in original). Of course, *Wong Sun* stands for a much narrower rule of exclusion.

The law enforcement agents in *Wong Sun* effected an unlawful arrest of defendant Toy, who denied selling narcotics but implicated co-defendant Yee. After voluntarily surrendering an ounce of heroin to the agents, Yee was arrested. Toy and Yee implicated co-defendant Wong Sun.

6. On the same day, the Court decided *United States v. Salvucci,* 448 U.S. 83, 95, 100 S.Ct. 2547, 2554, 65 L.Ed.2d 619 (1980), *rev'g* 599 F.2d 1094 (1st Cir.1979), eliminating the so-called "automatic standing" rule in *Jones,* 362 U.S. 257, 80 S.Ct. 725, whereby a defendant charged with a crime of possession was deemed to have "automatic standing" to challenge a search which disclosed the evidence of the criminal possession, without regard to whether the defendant had a legitimate expectation of privacy in the premises searched. *But cf. Simmons v. United States,* 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968) (defendant's testimony at suppression hearing excludable on issue of guilt at trial, on objection by defendant); *Salvucci,* 448 U.S. at 88, 100 S.Ct. at 2551 (same).

7. The defendant notes that the district court made no determination that he lacked "standing" to challenge the stop. *Cf. supra* note 4. We are not confined to a consideration of the grounds relied on by the district court. Rather, we will uphold its denial of the suppression motion if a "reasonable" view of the record supports it. *United States v. Veillette,* 778 F.2d 899, 902 (1st Cir.1985), *cert. denied,* 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986).

The more pertinent consideration in these circumstances is whether remand would be appropriate, either to permit factfinding or the presentation of further evidence. *Compare Rakas,* 439 U.S. at 131 n. 1, 99 S.Ct. at 424 n. 1 (remand denied where prosecutor had challenged defendants' "standing" at suppression hearing) *with Combs v. United States,* 408 U.S. 224, 227, 92 S.Ct. 2284, 2286, 33 L.Ed.2d 308 (1972) (per curiam) (prosecutor did not challenge defendant's "standing"). Prior to the suppression hearing in the present case, the government directly challenged defendant's "standing" to contest the constitutionality of the *Terry* stop. As the Court in *Rakas* stated in similar circumstances, "[t]he prosecutor's argument gave petitioner[ ] notice that [he was] to be put to [his] proof on any issue as to which [he] had the burden...." *Rakas,* 439 U.S. at 131 n. 1, 99 S.Ct. at 424 n. 1. Moreover, though defendant's brief before this court alludes to the issue of "standing," like the petitioners in *Rakas* he adverts to no evidence and makes no assertion, even on appeal, that he had any possessory or proprietary interest in the pick-up or its contents. Finally, and unlike the *Combs* case, *see* 408 U.S. at 227, 92 S.Ct. at 2286, the present record is replete with undisputed evidence, and reasonable inferences, that the pick-up truck driven by co-defendant Cline, and ostensibly owned by a friend of Cline, was stopped and detained while Soule was nowhere near, and that Soule had no proprietary or possessory interest in the vehicle, or its contents, and no right to exclude anyone from the vehicle.

The Supreme Court decided that the statement made by Toy immediately after his arrest, and the heroin later obtained from Yee, were tainted by the unlawful arrest of Toy and must be excluded *as against Toy. Wong Sun,* 371 U.S. at 484–85, 487–88, 83 S.Ct. at 415–16, 417–18. As to Wong Sun, however, the Supreme Court pointedly observed:

> The exclusion of the narcotics as to Toy was required solely by their tainted relationship to information unlawfully obtained from Toy, and not by any official impropriety connected with their surrender by Yee. *The seizure of this heroin invaded no right of privacy of person or premises which would entitle Wong Sun to object to its use at his trial.* Cf. *Goldstein v. United States,* 316 U.S. 114 [62 S.Ct. 1000, 86 L.Ed. 1312].

*Id.* at 492, 83 S.Ct. at 419 (emphasis added).

The co-defendant "derivative standing" doctrine advanced by Soule was severely undercut again a few years after *Wong Sun,* in *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969) ("We adhere to ... the general rule that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted."). Later, in *United States v. Payner,* 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980), the Court

> reaffirmed the established rule that a court may not exclude evidence under the Fourth Amendment unless it finds that an unlawful search or seizure violated the defendant's own constitutional rights. And the defendant's Fourth Amendment rights are violated only when the challenged conduct invaded *his* legitimate expectation of privacy rather than that of a third party. *Rakas v. Illinois,* 439 U.S., at 143 [99 S.Ct., at 430.]

*Id.* at 731, 100 S.Ct. at 2444 (emphasis in original) (citations omitted).[8] *See also* 4 W. LaFave, *Search and Seizure* § 11.4 at 371 (2d ed. 1987) ("Finally, it must be cautioned that a defendant, in any event, can prevail on a 'fruit of the poisonous tree' claim only if he has standing regarding the violation which constitutes the poisonous tree.") (footnote omitted).

As there is no assertion and no indication that the investigatory stop of the pick-up truck operated by co-defendant Cline infringed any legitimate expectation of privacy on the part of defendant Soule, our discourse resumes over the route mapped out in *Rakas,* bypassing any constitutional analysis of the investigatory stop.

C. Validity of Search Warrant

The defendant contends that the "probable cause" showing made in support of the state court search warrant must satisfy the more stringent standards of Massachusetts law, *see Massachusetts v. Upton,* 394 Mass. 363, 476 N.E.2d 548, 556–57 (1985), rather than federal constitutional standards, *see Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In the alternative, should federal constitutional standards be determined controlling, defendant argues that the state court warrant must meet the requirements of Federal Rule of Criminal Procedure 41(a).[9]

(1) State or Federal Warrant

Several factors shape the critical determination as to whether a state or federal search warrant is appropriate in the circumstances of a particular criminal investigation. *See, e.g., United States v. Mitro,* 880 F.2d 1480 (1st Cir.1989) (search warrant issued by assistant clerk of Massachusetts court at instance of local officer on strength of information acquired from federal agent in joint state-federal investiga-

8. *Payner* held that a defendant charged with falsifying a federal tax return, by denying that he had a foreign bank account, lacked "standing" to suppress documents illegally obtained by the Internal Revenue Service from an officer of the foreign bank in which the defendant had an account.

9. "A search warrant authorized by this rule may be issued by a federal magistrate or a judge of a state court of record within the district wherein the property or person sought is located, upon request of a federal law enforcement officer or an attorney for the government." Fed.R. Crim.P. 41(a).

tion, held valid state warrant); *United States v. Krawiec,* 627 F.2d 577 (1st Cir. 1980) (upholding search warrants obtained from state court judge by federal agent in state-federal investigation).

The present investigation began in response to an informant's tip transmitted by the DEA to the Hanover Police Department. The entire Massachusetts investigation was conducted by state and local police.[10] The Hanover Police Department conducted the three-day surveillance at 255 Broadway without federal assistance. The Hanover Police Department maintained telephone contact with the informant, through the DEA, until codefendant Cline was identified. The Hanover Police Department confirmed the informant's tips by corroborating all but one significant item of information transmitted by Agent Lively. The Hanover Police Department determined that Soule previously had been arrested locally on a drug possession charge, and it obtained record checks on vehicles entering and leaving 255 Broadway. Hanover police independently determined to stop the Cline pick-up. Detective Thomas Hayes prepared the affidavit submitted in support of the search warrant application. Local police were primarily responsible for the execution of the search warrant; a dozen local police officers and three DEA agents conducted the premises search at 255 Broadway. Hanover police arrested codefendant Cline and defendant Soule on state drug charges.[11]

In sum, circumstantial considerations determined the collaborative contributions made by state and federal authorities to their joint investigation. Thus, the DEA, not the local police, controlled the informant whose tips prompted the criminal investigation; whereas local police, not the DEA, possessed the resources required to corroborate the informant's tips, conduct an investigation at the scene, obtain and execute the warrants, and arrest the suspects.

Like *Krawiec,* "[t]his is not a case in which the federal agent was deliberately trying ... to escape proceeding under Rule 41." 627 F.2d at 582. A "federal agent who is not sure ... that any later prosecution will be federal should not be compelled to obtain from a state or a federal court a federal warrant with its special procedural requirements." *Id.*[12] These circumstances allow no room for an inference that the cooperating law enforcement officials, whether state or federal, acted other than in the interests of furthering the efficient investigation and prosecution of violations of state and federal law as warranted by the fruits of their investigation.

(2) Controlling Legal Standard

■ A state court search warrant lawfully obtained in the course of a joint criminal investigation resulting in a federal prosecution is evaluated under federal standards. *Mitro,* 880 F.2d at 1485 (" 'The products of a search conducted under the authority of a validly issued state warrant are lawfully obtained for federal prosecutorial purposes if that warrant [1] satisfies constitutional requirements and [2] does not contravene any Rule-embodied policy designed to protect the integrity of the

10. The DEA did not have adequate manpower to conduct the surveillance, especially since the length of the investigation could not be determined *ex ante.* Agent Lively requested that Lieutenant Hayes "do whatever he thought was appropriate, preferably some intermittent surveillances, to see what vehicles were at the residence." Lively testified that the DEA "didn't have enough men to handle the state and watch all the roads coming in."

11. A state court complaint was filed against co-defendant Cline. It is not clear whether a state court complaint was filed against defendant Soule. In his brief on appeal and again at oral argument, Soule stated that a state court complaint was filed against him. Lt. Paul Hayes testified that no state charges were filed against Soule prior to the issuance of the federal complaint.

12. The cooperating officers did not know in which court Soule would be prosecuted until after the execution of the search warrant; indeed, not until after his arrest on state charges. Lieutenant Hayes stated that, when he was making out the search warrant, "[w]e had no idea what we'd be filing [federal or state charges]." Lieutenant Hayes recalled that the decision to bring federal charges against Soule was made prior to Cline's arraignment in Hingham District Court.

federal courts or to govern the conduct of federal officers.") (quoting *United States v. Sellers,* 483 F.2d 37, 43 (5th Cir.1973), *cert. denied,* 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974)). *Accord Krawiec,* 627 F.2d at 580 n. 4.

Constitutional requirements are satisfied so long as there was probable cause to support the issuance of the warrant. *See* U.S. Const. amend. IV. We apply the "totality of the circumstances" test announced in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), most recently reiterated by us in *United States v. Caggiano,* 899 F.2d 99, 102 (1st Cir.1990) ("The central teaching of *Gates* is that 'probable cause is a fluid concept,' and its determination cannot be based on hard certainties and rigid rules") (citation omitted).[13] *Caggiano* elaborates the *Gates* standards guiding the issuing magistrate and reviewing courts in the determination of probable cause.

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed.

*Id.* at 102 (quoting *Gates,* 462 U.S. at 238–39, 103 S.Ct. at 2332–33). *See United States v. Aguirre,* 839 F.2d 854, 857–58 (1st Cir.1988); *New York v. P.J. Video, Inc.,* 475 U.S. 868, 877–78, 106 S.Ct. 1610, 1616, 89 L.Ed.2d 871 (1986) ("'probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity'") (quoting *Gates,* 462 U.S. at 244 n. 13, 103 S.Ct. at 2335 n. 13).

The Hayes affidavit contained ample evidence that, "'given all the circumstances, there [was] a fair probability that [marijuana would] be found [at 255 Broadway].'" *United States v. Moore,* 790 F.2d 13, 15 (1st Cir.1986) (quoting *United States v. White,* 766 F.2d 22, 25 (1st Cir.1985)). The law enforcement officers had been given a detailed description of the pick-up truck, its destination, and its contraband cargo, by an informant who had provided reliable information on numerous occasions in the past. On at least three prior occasions, tips from the same informant had led to the seizure of contraband or to the arrest of suspects.

The affidavit revealed that the Hanover Police Department surveillance at 255 Broadway had corroborated all material elements of the informant's tips, except the cargo. The proven reliability of the informant in numerous previous investigations, combined with contemporaneous corroboration of all other material elements of the current tip, lent substantial intrinsic verification to the informant's veracity and basis of knowledge. *See Alabama v. White,* — U.S. —, —, 110 S.Ct. 2412, 2417, 110 L.Ed.2d 301 (1990) ("*Gates* gave credit to the proposition that because an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity") (citing *Gates,* 462 U.S. at 244, 103 S.Ct. at 2335); *see also United States v. Francesco,* 725 F.2d 817, 823 (1st Cir.1984)

13. The defendant's contention that the present state court warrant must meet the *Aguilar–Spinelli* test, *see Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), which is applicable under Massachusetts law, *see Commonwealth v. Upton,* 394 Mass. 363, 476 N.E.2d 548 (1985), is mistaken. Federal law governs the admissibility of evidence in federal criminal trials, *see United States v. Jorge,* 865 F.2d 6, 10 n. 2 (1st Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 1762, 104 L.Ed.2d 198 (1989), including evidence seized pursuant to a state court warrant, *see United States v. Montgomery,* 708 F.2d 343, 344 (8th Cir.1983) (per curiam), and evidence obtained in the course of a state investigation, *see United States v. Pforzheimer,* 826 F.2d 200, 202–04 (2d Cir.1987). *See also United States v. Quinones,* 758 F.2d 40, 43 (1st Cir.1985) ("[i]t is well settled that in federal prosecutions evidence admissible under federal law cannot be excluded because it would be inadmissible under state law").

(affiant attests to his corroboration of "innocent" details of informant's tip about defendant getting into his car at his residence, carrying a package, and driving to alleged delivery point). The Hayes affidavit further disclosed that the police had seen Soule drive the pick-up truck to the barn, at the back of his mother's house, where they observed activity consistent with the unloading of the alleged cargo of contraband.

Finally, the affidavit was prepared by a police officer whose experience and expertise provided the clerk magistrate with further reason to credit the representation in the warrant application that marijuana would be found at 255 Broadway. *See, e.g., United States v. Ortiz,* 422 U.S. 891, 897, 95 S.Ct. 2585, 2589, 45 L.Ed.2d 623 (1975); *Grimaldi v. United States,* 606 F.2d 332, 337 (1st Cir.), *cert. denied,* 444 U.S. 971, 100 S.Ct. 465, 62 L.Ed.2d 386 (1979); *United States v. Fannin,* 817 F.2d 1379, 1382 (9th Cir.1987) ("magistrate may rely on the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found"). Moreover, to an experienced police officer possessed of the other information recited in the Hayes affidavit, the facially innocent act of driving the pick-up truck around to the back door of the barn, at the rear of the residence, rather than to the front door of the barn, would take on telling significance as to the type of cargo about to be unloaded.

Since direct sensory perception of suspected contraband is not a prerequisite for a search warrant, there was sufficient probable cause to support the issuance of the warrant to search the premises at 255 Broadway.

The rule-embodied policy intended to preserve the integrity of federal court proceedings and guide the conduct of federal law enforcement officers is implemented primarily through the requirement that search warrants be issued by a "neutral, detached officer capable of determining whether probable cause existed for the requested search." [14] *Mitro,* 880 F.2d at 1485–86. *Accord Shadwick v. City of Tampa,* 407 U.S. 345, 350, 92 S.Ct. 2119, 2122, 32 L.Ed.2d 783 (1972). The Supreme Court "long has insisted that inferences of probable cause be drawn by 'a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.'" *Shadwick,* 407 U.S. at 350, 92 S.Ct. at 2123 (quoting *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948)).

The defendant asserts, without citation to authority, that the purpose of the exclusionary rule is to deter forum shopping: "[p]ermitting law enforcement officers to choose whether the case will be brought in federal or state court after the warrant is executed by state officers on the basis that a prosecution in state court might not be successful because of police illegality is repugnant to notions of justice and due process." (emphasis omitted). Therefore, insists the defendant, apparently advocating our adoption of a uniform rule, every requirement of Federal Rule of Criminal Procedure 41(a) must be enforced in any case prosecuted in federal court.

These state and federal law enforcement agencies, responsible for the enforcement of overlapping criminal laws, collaborated in the present criminal investigation as their respective resources permitted, without any advance understanding as to whether a state or federal prosecution would eventuate. There simply is no indication in the present record that any "forum shopping" occurred. Thus, we reject the requested uniform rule as without purpose where no unlawful or other improper advantage is intended by recourse to a state-court warrant process which comports with federal requirements in all material respects. *See Mitro,* 880 F.2d at 1485

14. The Hingham District Court clerk magistrate was empowered to issue search warrants. *See* Mass.Gen.Laws Ann. ch. 218, § 33 (a clerk may "issue ... search warrants"). *See also United States v. Mitro,* 880 F.2d at 1486 n. 8 (Massachusetts law authorizes assistant clerk to issue search warrant). The defendant does not contend that the clerk magistrate was not "neutral and detached."

n. 7. *See also United States v. Sellers,* 483 F.2d 37, 43 (5th Cir.1973) ("If the warrant was issued under authority of Rule 41 as a federal warrant clearly it must comply with the requirements of the rule. If, however, the warrant was issued under authority of state law then every requirement of Rule 41 is not a *sine qua non* to federal court use of the fruits of a search predicated on the warrant, even though federal officials participated in its procuration or execution.").

AFFIRMED.