UNITED STATES of America

v.

**Angel E. ROSARIO.**

**CR. No. 95–099–01ML.**

United States District Court,
D. Rhode Island.

March 13, 1996.

Stephanie S. Browne, Assistant United States Attorney, Providence, RI, for Plaintiff.

Martin D. Harris, Providence, RI, for Defendant.

## MEMORANDUM AND ORDER

LISI, District Judge.

Defendant, Angel E. Rosario (Rosario), petitions this court to suppress certain evidence seized pursuant to a search warrant issued by a United States Magistrate Judge. Rosario alleges as grounds for his suppression motion that the affidavit upon which the search warrant was based failed to establish a nexus between Rosario's alleged criminal activity, the apartment to be searched, and the items to be seized. Rosario concludes that the affidavit did not provide sufficient information to support a probable cause find-

ing. Consequently, he argues, the fruits of the search must be suppressed.

The Government contends that the affidavit provided sufficient information to support the magistrate's determination. In the alternative, the Government avers that, even if the information contained in the affidavit was not sufficient for a probable cause determination, the fruits of the search should be introduced as evidence pursuant to the good faith exception outlined in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Additionally, as a third argument, the Government contends that the inevitable discovery rule would allow the admission into evidence of the articles seized from the apartment.

### The Affidavit

On November, 16 [1], 1995, Kathleen A. Kelleher (Kelleher), a Special Agent with the United States Drug Enforcement Administration (DEA), submitted an affidavit in support of the arrest of Rosario and William Escudero (Escudero), and, the search of two locations: apartment 10 at 140 Bourne Avenue, East Providence and the first floor apartment at 91 Barney Street, East Providence. Kelleher based the affidavit on her own investigation, information that she received from other law enforcement agents, and on information received from confidential informants. The pertinent information contained in the affidavit is as follows:

Escudero had been a subject of investigation by the DEA for an extended period of time. A confidential informant (informant) provided information that he/she had purchased cocaine from Escudero and/or his associates "75 to 100 times in the past." On September 21, 1995, the informant paged Escudero and Escudero agreed to sell the informant three ounces of cocaine for $3,000. Escudero explained to the informant that the delivery would be made by "a new guy driving a black Mazda RX." Escudero told the informant that they should meet at 6:30 p.m.

According to the informant, Escudero always used the same meeting place for the

sale of narcotics, a "Sunny Hill" store located on Dexter Street in the city of Central Falls. At approximately 6:30 p.m. Kelleher observed an "[H]ispanic male" arrive at the Sunny Hill store driving a black Mazda RX–7 with Rhode Island registration EQ–673. The Mazda was registered to Maria P. Castano of 264 Lowden Street in Pawtucket. The informant entered the Mazda and paid the driver $3,000 in return for three ounces of cocaine. After the transaction DEA agents followed the Mazda to 43 Humboldt Avenue in Pawtucket and "[l]ater that evening the Mazda was followed to 728 Beverage Hill Avenue" also in Pawtucket.

On October 5, 1995, the Mazda was driven from the Beverage Hill Avenue address and was followed to a local laundromat. While the Mazda was parked outside the laundromat, Escudero was seen walking "to the side of the building." Shortly after Escudero was observed, the Mazda was driven away from the laundromat. The Mazda was subsequently "pulled over" by police and the operator was asked for his driver's license. The license identified the driver as Rosario and listed his home address as 264 Lowden Street. During the stop, the police officer noticed that Rosario's wallet contained an employee identification badge from American Insulated Wire. After this incident the Mazda was seen parked at 728 Beverage Hill Avenue "for over a week, apparently without being driven."

On October 19, 1995, the informant again paged Escudero and arrangements were made for another purchase of three ounces of cocaine. Surveillance was again set up in the area of the Sunny Hill store. A "person later identified as Rosario" walked to the informant's car, entered it, and the informant drove to a position about one block away from the Sunny Hill store. Once parked at this location, the informant gave Rosario $3,000 in return for three ounces of cocaine. After the transaction Rosario left the area driving a 1986 blue Oldsmobile with Rhode Island registration EK–980. The Oldsmobile was registered to Rosario at 264 Lowden Street.

---

**1.** The affidavit is actually dated October 16, 1995. However, as noted in the initial appearance hearing held before the magistrate, the October notation was a typographical error.

On November 1, 1995, DEA agents began a surveillance of 30 Burgess Avenue in East Providence based upon information that Escudero could be contacted at that address. During the surveillance DEA agents observed Escudero and a female [2] placing items into two automobiles, a blue Mercury bearing Rhode Island registration EK–979 and a brown Taurus with temporary license plates. EK–979 was also registered to Rosario at the Lowden Street address. Escudero was observed leaving the Burgess Avenue location driving the blue Mercury. On November 3, 1995, the brown Taurus was seen at the Burgess Avenue address with Rhode Island registration KN–265. License plate KN–265 was registered to Christie Clarke, however, registry records indicated that KN–265 was registered to a 1986 blue Oldsmobile which bore the same vehicle identification number as the 1986 blue Oldsmobile registered to Rosario with license plate EK–980.

On November 13, 1995, DEA agents conducted a surveillance at American Insulated Wire. At approximately 7:25 a.m. the blue Oldsmobile, driven by Rosario and bearing license plate EK–980, was seen leaving the American Insulated Wire parking lot. Rosario drove the Oldsmobile to 140 Bourne Avenue in East Providence. The affidavit states that "a check with Narragansett Electric shows that electricity for apartment 10 at that address is listed in Rosario's name."

The remainder of the affidavit summarizes Kelleher's training, experience and opinions regarding the general behavior of drug traffickers. Based upon Kelleher's twelve years of experience, including her "extensive training in the means and methods used by persons in the drug trafficking business," and her participation in the execution of "at least" one hundred state and federal search warrants, Kelleher concluded that (1) "drug traffickers, more often than not, keep controlled substances, as well as records containing names, addresses, and telephone numbers of purchasers and suppliers of controlled substances, and records of amounts of money owed both to and by the drug seller in their homes and in other premises used by them[,]" and, (2) drug dealers "oftentimes keep proceeds of their drug sales" in their homes and in premises used by them.

## Discussion

"The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. The Stanford Daily,* 436 U.S. 547, 556, 98 S.Ct. 1970, 1976–1977, 56 L.Ed.2d 525 (1978). The probable cause dictate ensures that a warrant will issue only upon a showing that the totality of the circumstances gives rise to a fair probability that a search of the target premises will uncover evidence of a crime. *United States v. Jewell,* 60 F.3d 20, 22 (1st Cir.1995). The task of an issuing magistrate is to make a practical common-sense decision whether, taking into consideration all of the circumstances as summarized in the affidavit, there is a fair probability that evidence or contraband will be located at a particular place. *United States v. White,* 766 F.2d 22, 23 (1st Cir.1985). The affidavit must be interpreted in a common-sense rather than a "hypothetical or hypertechnical manner." *Jewell,* 60 F.3d at 22. "A finding of probable cause can be supported by less evidence than is required to support a conviction ... and not all plausible lawful explanations of the situation must be negated." *White,* 766 F.2d at 25. A magistrate's determination that information in a particular affidavit establishes probable cause is accorded great deference. *United States v. Ciampa,* 793 F.2d 19, 22 (1st Cir. 1986). The task of a reviewing court is to ensure that the magistrate had a substantial basis for concluding that probable cause existed. *United States v. Taylor,* 985 F.2d 3, 5 (1st Cir.), *cert. denied,* 508 U.S. 944, 113 S.Ct. 2426, 124 L.Ed.2d 647 (1993).

Onerous quandaries may arise, however, when direct information regarding the location of the alleged incriminatory objects is not available and "it must be determined what reasonable inferences may be

---

**2.** The affidavit provided that the female was "believed to be" Christie Clarke who had been arrested by Providence Police in 1990 for possession with intent to deliver heroin.

entertained concerning the likely location of those items." 2 Wayne R. Lafave, Search and Seizure § 3.7(d) at 103 (2d ed. 1987).

"[T]he nexus between the objects to be seized and the premises searched do not have to rest on direct observation, but can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime]...." *United States v. Charest*, 602 F.2d 1015, 1017 (1st Cir.1979); *see also, United States v. Kenney*, 595 F.Supp. 1453, 1461 (D.Me.1984) (noting that in a drug trafficking scenario "there must be some indication that the home is implicated to warrant the major intrusion of a search" and that a proper nexus could be established by, among other things, observing defendant at his residence just prior to a narcotics transaction or when a defendant's home had previously been found with drugs in it and the transaction took place in close geographical proximity to the home).

There is no fast or fixed checklist of vital criteria for determining probable cause. An analysis of probable cause must be undertaken in light of all of the attendant circumstances.

"The cause necessary to make a thing 'probable' is determined under an objective standard. Therefore, an affidavit is sufficient when it 'demonstrates in some trustworthy fashion the likelihood that an offense has been committed and that there is sound reason to believe that a particular search will turn up evidence of it.' ... Probability is the touchstone.... [T]here is no hard-core checklist of independent factors, mechanistically to be applied. All of the relevant data should be used instead to illuminate 'the common sense, practical question whether there is 'probable cause' to believe that the contraband or evidence is located in a particular place.'" *United States v. Nocella*, 849 F.2d 33, 39 (1st Cir.1988) (citations omitted).

■ A court reviewing a probable cause determination has within its discretion the choice whether to proceed directly to the good faith exception analysis or to first discuss the probable cause decision. *See Leon*, 468 U.S. at 924–925, 104 S.Ct. at 3421–3422; *see also United States v. Jordan*, 999 F.2d 11, 13 n. 1 (1st Cir.1993). Because this case raises what this court believes is a novel issue for this circuit, the court will first analyze and discuss the probable cause determination.

■ At the outset, this court acknowledges that the probable cause determination in this instance is indeed a close call. The affidavit reflects that Rosario sold cocaine on one occasion to the informant. The affidavit discloses that Rosario associated with persons who had experience in drug trafficking. The affidavit indicates that Rosario had automobiles registered to him at an address where he was never observed. The affidavit also demonstrates that the apparent "arrangement" with regard to the use and registration of certain vehicles, when considered in light of Rosario's behavior and associations, raises certain common-sense inferences of illicit activity. The court finds that the affidavit supports a determination that Rosario participated in illegal activity.

■ The affidavit, however, lists only one instance where Rosario was observed at the Bourne Avenue address. That observation did not occur as he left for or returned from a drug transaction or a meeting with Escudero and/or his "other associates." The affidavit notes that the police officers followed Rosario, driving the same blue Oldsmobile in which he departed the narcotics sale, from American Insulated Wire to the Bourne Avenue address. This observation occurred, however, approximately three weeks after the narcotics sale.

A reasonable inference that Rosario lived at 140 Bourne Avenue may be based on the time of the observance (7:30 a.m.), the premise that he was most likely on his way "home" from work, and the fact that electricity supplied to the apartment was listed in his name. Beyond these factual assertions, the affidavit lacks any material nexus between Rosario's illicit activity and the Bourne Avenue address. In fact, close scrutiny of the affidavit reveals that the only allegations to support the inference that evidence of

Rosario's alleged criminal activity would be found at the Bourne Avenue address are the conclusory declarations made by Kelleher based upon her training and experience. Except for these averments by Kelleher, the affidavit is devoid of any factual basis which would indicate that contraband or evidence of alleged criminal behavior would be found at the Bourne Avenue address.

The question presented to this court is whether the opinion of a government agent based upon her knowledge of the behavior and practices of narcotics dealers can, *by itself,* furnish the requisite nexus between the criminal activity and the place to be searched. *See generally United States v. Rios,* 881 F.Supp. 772 (D.Conn.1995); *see also United States v. Schultz,* 14 F.3d 1093, 1097 (6th Cir.1994) (noting that an officer's training and experience may be considered in a probable cause determination, however, it "cannot substitute for the lack of evidentiary nexus"); *United States v. Benevento,* 836 F.2d 60, 71 (2nd Cir.1987), *cert. denied,* 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988) (agent's opinion "standing alone, might not be sufficient to establish a link" between the place searched and the alleged criminal activity); *but see United States v. Thomas,* 989 F.2d 1252 (D.C.Cir.1993) (probable cause to search defendant's residence based upon premise that defendant was involved in narcotic transaction and government agent stated that in his experience drug traffickers secrete evidence of their illegal activities in their homes); *United States v. Johnson,* 660 F.2d 749 (9th Cir.1981), *cert. denied,* 455 U.S. 912, 102 S.Ct. 1263, 71 L.Ed.2d 452 (1982) (same); *cf. United States v. Angulo–Lopez,* 791 F.2d 1394, 1399 (9th Cir.1986) (noting that "[i]n the case of drug dealers, evidence is likely to be found where the dealers live," and when drug dealing involves "ringleaders" and "assistants" "a fair probability exists that drugs will be present at the assistants' residence as well as the ringleader's").

The government relies upon *United States v. Soule,* 908 F.2d 1032, 1040 (1st Cir.1990) (citing *United States v. Fannin,* 817 F.2d 1379, 1382 (9th Cir.1987)), for the proposition that a magistrate may rely upon the conclusions of an experienced law enforcement officer regarding where evidence of a crime is likely to be found. In *Soule* the government received a tip from a confidential informant regarding an impending shipment of 1500 pounds of marijuana to the defendant. *Soule,* 908 F.2d at 1033. The informant told the government that the marijuana was to be delivered in a copper Ford F–250 pick-up truck with chrome "mag" wheels, a "cap" over its load bed and bearing Ohio license plate N3872B. *Id.* The following day the police observed the Ford pick-up truck at the defendant's mother's residence. *Id.* That evening the police noticed the defendant emerge from the house, enter the truck and drive the truck across the lawn to the back of the house. *Id.* The truck was backed up to a pedestrian doorway at the rear of a two-story garage[3] attached to the house. After the truck was moved to this position the police observed movement inside the garage. *Id.* Approximately one and one-half hours later, police observed the truck leave the residence. *Id.* After following the truck for about a quarter of a mile the police stopped the truck and detected an odor of alcohol on the driver's breath and an odor of marijuana emanating from the back of the vehicle. *Id.* at 1033–34. The police also observed that the load bed of the truck was empty. *Id.* at 1034. A common-sense inference that whatever cargo was on the load bed had been off loaded into the attached garage was therefore reasonable. The driver, a co-defendant, was identified as a fugitive wanted pursuant to a federal warrant for conspiracy to possess with the intent to distribute marijuana and was under indictment in connection with the importation of 200,000 pounds of marijuana. *Id.* at 1034. The driver of the truck was arrested and a search warrant for the resi-

---

**3.** At the beginning of its decision the *Soule* court referred to the attached structure as a garage. *Soule,* 908 F.2d at 1033. Later in the decision the court referred to the structure as a barn. *Id.* at 1040. Cases connected to *Soule* describe the structure as a barn attached to the house. *See United States v. Parcels of Real Property Located* *at 255 Broadway,* 795 F.Supp. 1225, 1227 (D.Mass.1992), *aff'd,* 9 F.3d 1000, 1002 (1st Cir. 1993). It is clear that the *Soule* court was referring to the same attached structure throughout its opinion; the inconsistency regarding the description of the structure does not impact this court's interpretation of *Soule.*

dence was issued the following day. *Id.* at 1033.

In holding that the warrant contained sufficient information for a probable cause determination the *Soule* court noted that the law enforcement officers had been given detailed information from an informant who had provided reliable information in the past. *Id.* at 1039. The surveillance at the residence had corroborated all of the material elements of the informant's tip except the type of cargo. *Id.* The proven reliability of the informant and the corroboration of all the material elements of the tips "lent substantial intrinsic verification to the informant's veracity and basis of knowledge." *Id.* The affidavit also provided that the police saw the defendant drive the truck to the garage attached to the residence where they observed activity consistent with the unloading of the alleged cargo of contraband. *Id.* Consequently, an inference that the alleged cargo of contraband was in the residence was reasonable.

*Soule* is readily distinguishable from the case at bar. As noted above, the only material information in the affidavit which links the Bourne Avenue apartment to criminal activity are the assertions of Kelleher, based upon her knowledge of how most drug dealers operate. Unlike *Soule*, where the target residence had an immediate temporal and geographic nexus to the illicit activity, any facts which would establish a nexus to the Bourne Avenue apartment are conspicuously lacking in the instant case.

The Government reads too much into the *Soule* court's citation of *Fannin*. While the *Soule* court does cite to *Fannin*, it is clear that the First Circuit did not go so far as to adopt the Ninth Circuit's holding. Instead, the First Circuit refers to the agent's experience and expertise as an additional element which may be considered by a magistrate in evaluating the sufficiency of the affidavit, particularly since such experience and expertise may, as it did in *Soule*, provide reasonable explanation for conduct which to the untrained eye may appear "facially innocent." *Soule*, 908 F.2d at 1040.

In *Charest* the First Circuit noted that courts should rely on normal common-sense inferences to provide the evidentiary nexus between the objects to be seized and the premises searched. *Charest*, 602 F.2d at 1017. These inferences may take into consideration the nature and extent of the alleged illicit activity. *See id.* Having applied these principles to the particular circumstances of this case, this court determines that any inference that 140 Bourne Avenue was in any way implicated in the illicit drug activity of Escudero and Rosario arises solely from Kelleher's opinions as stated in the affidavit. While this court acknowledges the extensive training and expertise of agent Kelleher, her statements in the affidavit simply provide generalized information regarding how drug traffickers operate.

■ The Fourth Amendment protects the security of persons when they place themselves or their property within a constitutionally protected area such as a home. *Hoffa v. United States*, 385 U.S. 293, 301, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966). The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed...." *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972). "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house." *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980). To permit a search warrant based solely upon the self-avowed expertise of a law-enforcement agent, without any other factual nexus to the subject property, would be an open invitation to vague warrants authorizing virtually automatic searches of any property used by a criminal suspect. *See Schultz*, 14 F.3d at 1098; *see also United States v. Gomez*, 652 F.Supp. 461, 463 (E.D.N.Y.1987). This court concludes that the totality of the circumstances, as summarized within the four corners of the affidavit, did not give rise to a fair probability that the search of 140 Bourne Avenue would uncover contraband or evidence of a crime. Accordingly, the affidavit did not provide the magistrate a substantial basis for concluding that probable cause existed to search the Bourne Avenue address.

532

*Leon and the "Good Faith Exception"*

 A determination that the totality of the circumstances did not give rise to a fair probability that a search would uncover evidence of a crime is not, however, the end of this court's analysis. "In *Leon,* the United States Supreme Court held that evidence seized by police officers acting in objectively reasonable good faith reliance on a search warrant issued by a neutral and detached magistrate, but ultimately found to be unsupported by probable cause, need not be suppressed." *United States v. Bonner,* 808 F.2d 864, 867 (1st Cir.1986), *cert. denied,* 481 U.S. 1006, 107 S.Ct. 1632, 95 L.Ed.2d 205 (1987). The application of the exclusionary rule is warranted only in those circumstances where its remedial objectives are "best served, i.e., to deter illegal police conduct, not mistakes by judges and magistrates." *Id.* The *Leon* court outlined three instances wherein good faith reliance upon a neutral magistrate's conclusion of probable cause could not be supported. *Leon,* 468 U.S. at 923, 104 S.Ct. at 3420. Suppression of evidence remains appropriate where (1) the affiant has submitted an affidavit containing false information or information the affiant should have known was false, (2) the magistrate has "wholly abandoned his judicial role," and, (3) the affidavit upon which the warrant was based was "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *Id.; see also United States v. London,* 66 F.3d 1227, 1238 (1st Cir.1995), *petition for cert. filed,* 64 U.S.L.W. 3511 (U.S. Jan. 18, 1996) (No. 95–1156) (noting that " 'suppression is appropriate only if the officers were dishonest or reckless in preparing [the warrant] affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause' ") (quoting *Leon,* 468 U.S. at 926, 104 S.Ct. at 3422).

 During argument upon this motion Rosario claimed that the "affidavit supporting the warrant is so lacking in indicia of probable cause as to render a belief in its existence unreasonable." A law enforcement officer's reliance upon a magistrate's probable cause determination and on the technical sufficiency of the warrant must be objectively reasonable. *Leon,* 468 U.S. at 922, 104 S.Ct.

at 3420. The test of objective good faith is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* at 922 n. 23, 104 S.Ct. at 3420 n. 23.

 This court finds nothing in this record to support Rosario's bad faith claim. Rosario has presented no evidence that Kelleher's reliance on the affidavit was not objectively reasonable. Additionally, the law regarding whether or not a law-enforcement agent's opinion can, in and of itself, provide probable cause to search a premises has not been specifically addressed in this circuit. Indeed, it appears to be the subject of debate among other circuits. *See, e.g., Schultz,* 14 F.3d at 1097; *Benevento,* 836 F.2d at 71; *Thomas,* 989 F.2d at 1254–55; *Johnson,* 660 F.2d at 753; *see also Rios,* 881 F.Supp. at 777 & n. 3; 2 Lafave, § 3.7 at 30 n. 119.1 (2d ed. Supp.1994). Given the difference of opinion among the appellate courts, and the uncertainty on this issue in our own circuit, it would be unrealistic to expect a DEA agent to presage the validity of this warrant. *See Leon,* 468 U.S. at 922, 104 S.Ct. at 3420. According to *Leon,* a defendant must show a lack of objectively reasonable good faith reliance on the warrant. *See id.* at 926, 104 S.Ct. at 3422. On the facts of this case, I find no evidence of any such deficiency.

 Furthermore, the court cannot ignore the information that the affidavit contained. This court has already noted that it finds that the probable cause determination was a close call. If circumstances arise wherein that determination is a "border line call," *Leon* teaches that the "evidence may be used, despite the warrant's defectiveness." *United States v. Ricciardelli,* 998 F.2d 8, 15 (1st Cir.1993). The affidavit was not so facially deficient that the officers could presume it to be invalid. The affidavit clearly reflected that Rosario was involved with persons associated with illicit narcotics sales. The affidavit stated that Rosario was involved in at least one verified narcotics sale which occurred as a result of a request to purchase narcotics from Escudero, a confirmed narcotics dealer. Rosario was also engrossed in what appeared to be circumstances involving automobile and registration

"swapping" and had vehicles registered to him at an address where he was never observed. The warrant was not " 'so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable.*'" *Leon*, 468 U.S. at 923, 104 S.Ct. at 3421 (quoting *Brown v. Illinois*, 422 U.S. 590, 610–611, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1975) (Powell, J., concurring in part)) (emphasis added). "It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment." *Leon*, 468 U.S. at 921, 104 S.Ct. at 3419. "[A]n officer cannot be expected to question the magistrate's probable cause determination...." *Id.* The court finds that Kelleher was entitled to believe, as the magistrate found, that she had set forth sufficient information in the affidavit to support the search of 140 Bourne Avenue. Accordingly, the evidence seized at Bourne Avenue may be introduced at trial pursuant to the good faith exception to the exclusionary rule.

Since this court has determined that the evidence is admissible pursuant to *Leon*, I need not decide whether the inevitable discovery rule should apply in this case.

For the foregoing reasons Rosario's motion to suppress is denied.